### UNITED STATES of America,

v.

Giuseppe GAMBINO, a/k/a "Joe," Rosario Naimo, a/k/a "Saro," a/k/a "Don Saro," a/k/a "Sarino," a/k/a "Sal," a/k/a "Casimiro DiLorenzo," a/k/a "Barry Beiner," Lorenzo Mannino, a/k/a "Lore," Francesco Inzerillo, a/k/a "Frank," a/k/a "Ciccio," Matteo Romano, Emanuele Adamita, a/k/a "Manuele," a/k/a "Mario DiLorenzo," a/k/a "Stephan Milazzo," Joseph Larosa, a/k/a "Little Joe," a/k/a "Cardillo," Salvatore Lobuglio, a/k/a "Toto," a/k/a "the engineer," Giuseppe D'Amico, a/k/a "Pino," a/k/a "Joe," Salvatore D'Amico, Francesco Cipriano, a/k/a "Frank," a/k/a "Ciccio," a/k/a "Francino," Salvatore Candela, a/k/a "Toto," Paolo D'Amico, Carmelo Guarnera, and John Doe, a/k/a "Sasha," Defendants.

No. 6th "S" 88 Cr. 919 (PKL).

United States District Court,
S.D. New York.

April 19, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Andrew C. McCarthy, Frances M. Fragos, David N. Kelley, of counsel), for U.S.

Lionel R. Saporta, Edward Panzer, New York City, for defendant Gambino.

John M. Apicella, Charles Carnesi, Salvatore Russo, Brooklyn, N.Y., for defendant Mannino.

Ira J. Friedman, Brooklyn, N.Y., for defendant Inzerillo.

Philip R. Edelbaum, New York City, for defendant Romano.

Martin G. Fogelson, New York City, for defendant Adamita.

Golub & Dunn, New York City, Mitchell A. Golub, for defendant LaRosa.

Edward M. Kratt, New York City, for defendant LoBuglio.

Martin Geduldig, Hicksville, N.Y., for defendant Giuseppe D'Amico.

Thomas D. White, New York City, for defendant Cipriano.

Culleton & Marinaccio, Bronx, N.Y., James Culleton, for defendant Candela.

Brown, Berne, & Serra, Bronx, N.Y., Wesley M. Serra, for defendant Guarnera.

## ORDER AND OPINION

LEISURE, District Judge:

Defendant Giuseppe Gambino has filed a motion to suppress evidence in the form of conversations recorded by the federal government using electronic eavesdropping devices. Gambino is joined in his motion by all other defendants before the Court. Gambino claims that the government has violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"), and the fourth amendment to the U.S. Constitution. Gambino argues that the conversations recorded by the government should be suppressed due to these statutory and constitutional violations. Defendants LoBuglio, Inzerillo, Cipriano, Guarnera, and Candela have filed motions to suppress evidence as well, based on Title III and the fourth amendment to the U.S. Constitution (the "fourth amendment").

## BACKGROUND

On December 14, 1989, the grand jury returned the sixth superseding indictment (the "indictment") against the defendants in this case.[1] The evidence presented to the grand jury was the result of a long-term investigation by the federal government into an international organization which has come to be known variously as "the mafia" or "la cosa nostra." According to the indictment filed in this case, this organization is responsible for the importation and distribution of large quantities of narcotics in violation of federal law. To supplement its income from the narcotics trade, the organization also allegedly participates in gambling, loansharking, and extortion. The indictment charges that murder and other acts of violence are carried out by members of the organization to facilitate its operations.

As part of its investigation into this alleged criminal organization, the government petitioned the Honorable Mark A. Costantino, United States District Judge for the Eastern District of New York, for an order pursuant to 18 U.S.C. § 2518 authorizing the electronic interception of oral communications at the Caffe Giardino, an alleged headquarters for the conspiracy's leadership. On March 9, 1988, two govern-

---

1. The first indictment was filed by the Grand Jury on December 14, 1988. Of the defendants charged in the sixth superseding indictment, Rosario Naimo, Paolo D'Amico and John Doe, a/k/a "Sasha," are fugitives.

ment lawyers [2] filed an application with Judge Costantino supported by a 93–page affidavit sworn to by John G. Nemec, Jr., a Special Agent of the Federal Bureau of Investigation ("FBI" or "F.B.I.") who was closely involved in the investigation. (G.Ex. 1 and 2).[3] Based on the application and the supporting affidavit, Judge Costantino issued an order dated March 9 (the "March 9 order") which stated that probable cause had been established to believe, *inter alia*, that Giuseppe Gambino, Lorenzo Mannino, and others were engaging in illegal narcotics transactions, that interception of oral communications at the Caffe Giardino would reveal evidence of these crimes, and that normal investigative techniques would be unlikely to succeed if attempted. (G.Ex. 3). The March 9 order also authorized Special Agents of the F.B.I. to enter the Caffe Giardino covertly and surreptitiously to plant the eavesdropping devices. (G.Ex. 3, at 5).

As required by Title III, the government applied for extensions of the March 9 order every thirty days through mid-November 1988. Each extension application was supported by the affidavit of Special Agent Nemec, who supplemented his initial sworn statements with evidence gained from the electronic eavesdropping. Each application was granted by Judge Costantino. In the extension order dated June 16, 1988, Judge Costantino stated that probable cause had been established to believe that Giuseppe

Gambino and others were engaged in extortion in violation of 18 U.S.C. §§ 892, 893, 894, and 371. (G.Ex. 12, at 2–3). In the extension order dated November 18, 1988, Judge Costantino added that probable cause had been established to believe that Gambino, Francesco Inzerillo, Lorenzo Mannino, Matteo Romano, Giuseppe D'Amico, and others were managing an illegal gambling enterprise in violation of 18 U.S.C. § 1955. (G.Ex. 27, at 2–3). On December 1, 1988, the defendants were arrested, and no further extensions of the electronic eavesdropping order were sought.

## DISCUSSION

### I. GIUSEPPE GAMBINO'S MOTIONS

#### A. Installation of the Caffe Giardino Bugs

Gambino alleges that the participation of government confidential informant William Kane in the installation of the Caffe Giardino bugs was unauthorized and illegal, and that therefore the fruits of those bugs— the hundreds of hours of recorded conversations—should be suppressed. Gambino claims that Kane's entries into the Caffe, and his placement and maintenance of the surveillance devices, violated Title III, the fourth amendment, and the explicit requirements of Judge Costantino's March 9 order. Each of these arguments will be considered in turn.

---

**2.** The lawyers were Louis J. Freeh, Assistant United States Attorney for the Southern District of New York, and Joel M. Friedman, Attorney-in-Charge, Philadelphia Strike Force of the United States Department of Justice.

**3.** References in the form "G.Ex. __" are to the Gambino Exhibits submitted in support of the instant motion by defendant Giuseppe Gambino; references in the form "Govt.Ex. __" are to the government's exhibits; and references to exhibits submitted by other defendants are identified as to that defendant (*e.g.*, "Cipriano Ex. __").

Attached and incorporated by reference to Special Agent Nemec's affidavit were seven affidavits sworn to by Special Agent Paul Hayes, Jr., of the Philadelphia office of the FBI. (G.Ex. 28–34). The Hayes affidavits in turn incorporated by reference numerous other affidavits (*see* Hayes Affidavit of November 9, 1987, G.Ex.

31, at 10–12) sworn to by Hayes and Special Agent William L. Fleming. (*See* G.Ex. 36–55).

Gambino has calculated the complete number of pages of affidavits put before Judge Costantino at 1,464. Gambino points out that the government's application and Judge Costantino's March 9 order are dated and timed simultaneously—on March 9, 1988 at 11:51 a.m. Gambino questions whether Judge Costantino referenced or absorbed any of the supporting evidence. Reply Affidavit of Lionel R. Saporta, Esq., sworn to in January, 1990, ¶ 5. The Court believes that Gambino bears a heavy burden to show that this respected federal judge signed an electronic surveillance order without considering to his satisfaction the materials submitted in support of the government's application. In any case, the date and time at which the affidavit was sworn does not necessarily indicate when Judge Costantino first viewed the contents of the affidavit.

Gambino relies on a series of five articles written in a New Jersey newspaper, the *Courier–Post,* for factual information. (G.Ex. 57).[4] Gambino points to quotations in the articles attributed to Kane stating that Kane assisted two FBI technicians in entering the Caffe Giardino as early as September 1987 to install bugs, several months before the government applied to Judge Costantino for an authorization order pursuant to Title III. The articles also report that Kane entered the Caffe Giardino alone on several occasions to activate or repair listening devices. Gambino claims that these alleged improprieties mandate suppression of the tapes.

The Court requested that the government produce Kane for live testimony concerning, *inter alia,* his activities in installing, activating, maintaining, or replacing electronic eavesdropping devices inside the Caffe Giardino. The Court's factual inquiry focused on whether Kane's role in the surveillance process in any way violated the requirements of Title III or the fourth amendment.

Kane testified that on multiple occasions he had activated and effected minor repairs on electronic surveillance equipment inside the Caffe Giardino under the supervision of

FBI technicians, but not in the presence of government agents. (Tr. 22–24, 26).[5] Kane also testified that he had replaced entire units which were malfunctioning. (Tr. 24–25). Kane stated that he was in general unfamiliar with the use of surveillance devices, had followed the instructions of FBI technicians closely, and had not taken part in any of the actual interceptions of conversations inside the Caffe Giardino. (Tr. 24, 27–28). The question for the Court is whether any of Kane's actions violate Title III or the fourth amendment.

### 1. Statutory Argument

█ Gambino argues that certain provisions of Title III indicate that only the federal government, or those acting under contract with or supervision of the government, may be authorized to intercept electronically oral communications. *See* 18 U.S.C. §§ 2516(1), 2518(5).[6] Gambino's contentions based on these provisions in Title III are contradicted by the definition of "interception" provided by Congress in the context of Title III. "Interception," as defined at 18 U.S.C. § 2510(4), "means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechani-

4. The reliability of this series of articles is continually disputed throughout the motion papers. Kane testified before the Court that though he personally gave information to the author of the newspaper articles, he believes that the articles are not factually accurate. (Transcript of evidentiary hearing held before the Court, March 26–27, 1990 (hereinafter "Tr."), at 29–30). The journalist, a reporter named Dennis P. Culnan, has submitted an affidavit stating that, although he will not discuss the manner in which he obtained the facts of the story, he does continue to stand by all of the facts assertions in the articles. Affidavit of Dennis M. Culnan, sworn to in January, 1990, ¶¶ 3–4. Gambino served a subpoena on Culnan to appear and present live testimony concerning his meetings with Kane, and to produce any relevant documentary evidence. In a Memorandum Order dated April 11, 1990, the Court quashed the subpoena based on the journalist's first amendment privilege against disclosure of his sources and work product. The Court has requested an *in camera* inspection of the journalist's notes to look for evidence that bugging occurred at the Caffe prior to March 1988. The Court's order for an *in camera* inspection is now the subject of a mo-

tion for reargument filed by the journalist. The Court will not delay the issuance of this Order and Opinion, however, while the journalist's reargument motion is being resolved. The Court will modify this Order and Opinion if necessary in light of a future *in camera* inspection.

5. References in the form "Tr." are to transcript of the evidentiary hearing conducted by the Court on March 26 and 27, 1990.

6. Section 2516(1) provides in part that upon the fulfillment of certain requirements, a federal judge may grant "an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense...."

Section 2518(5) provides in part that "[a]n interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception."

cal, or other device." *See United States v. New York Telephone Co.*, 434 U.S. 159, 166–67, 98 S.Ct. 364, 369–70, 54 L.Ed.2d 376 (1978) (in holding that pen registers are not "interceptions" under Title III, the Court stressed that an "interception" must relate to an "aural acquisition" of the "contents" of the communications); *United States v. Turk*, 526 F.2d 654, 657–58 (5th Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). The provisions of Title III cited by Gambino are properly read as only relating to the actual interception of the oral communications, and are not relevant to how the listening devices are installed.[7]

Gambino argues in response that Title III is a broad-based attempt by Congress to regulate all aspects of electronic surveillance to insure that the privacy interests of the U.S. citizenry are protected. *See Dalia v. United States*, 441 U.S. 238, 249–54, 99 S.Ct. 1682, 1689–92, 60 L.Ed.2d 177 (1979); *United States v. Villegas*, 899 F.2d 1324 (2d Cir.1990).[8] Gambino claims that both the actual interception of oral communications *and* the installation of listening devices should be considered as part of a unified process culminating in the actual electronic interception. Gambino indicates provisions in Title III which regulate not just the " 'interception' (as defined in 18 U.S.C. § 2510(4)) itself, but the entire process effectuating such interception." Reply Memorandum of Law of Giuseppe Gambino, at 6. Gambino points to § 2512 (regulating the manufacture, possession and distribution of eavesdropping devices) and

§ 2518(4) (allowing the court to order technicians, landlords and custodians to assist the government in effecting the interception, such as by giving technical assistance or providing facilities and information).

While the Court accepts Gambino's contentions that Title III is concerned with the entire process of electronic surveillance, and that the installation of bugs and the actual interception of conversations are closely intertwined, nothing that Gambino has brought to the Court's attention challenges the government's position that "interception," as defined in § 2510(4) and employed in §§ 2516(1) and 2518(5), does not include the installation of listening devices. For this reason, nothing in the text of Title III would prohibit Kane from participating, either alone or with government agents, in the installation of the Caffe Giardino bugs. As will be discussed below, the Court believes that it is the fourth amendment rather than Title III which is most relevant to Gambino's claims.

**2. Constitutional Argument**

■ Gambino argues that Kane's participation in the entry of the Caffe Giardino and the placement and maintenance of the bugs violated the fourth amendment to the U.S. Constitution.[9] As Kane was acting as an " 'agent of the government or with the participation or knowledge of any governmental official,' " his actions may be challenged on fourth amendment grounds. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85

**7.** In *United States v. Scafidi*, 564 F.2d 633, 638 (2d Cir.1977), *cert. denied sub nom. Vigorito v. United States*, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 (1978), the Second Circuit held that Title III confers standing to all "aggrieved persons" to object to unauthorized electronic surveillance, but that standing to object to a covert entry to install bugs is established only by showing an "expectation of privacy" in the premises, a traditional fourth amendment threshold. This ruling suggests a distinction between actual aural interceptions of conversations and covert entries into private premises to install listening devices.

**8.** The Supreme Court held in *Dalia* that Congress did consider covert entries needed to install eavesdropping devices in passing Title III,

and implicitly permitted courts to authorize covert entries for the purpose of such installations. *Dalia, supra*, 441 U.S. at 249–54, 99 S.Ct. at 1689–92. This realization by the Supreme Court of the interrelationship of covert entries and the actual electronic interceptions, however, cannot be read as changing the clear meaning of the word "interception" in §§ 2516(1) and 2518(5).

**9.** Gambino had a reasonable expectation of privacy in all relevant areas of the Caffe Giardino, and thus has standing to assert a claim under the fourth amendment. *See United States v. Villegas*, 899 F.2d 1324 (2d Cir.1990); *United States v. Zapata–Tamallo*, 833 F.2d 25, 27 (2d Cir.1987); *United States v. Scafidi, supra*, 564 F.2d 633; Reply Affidavit of Lionel R. Saporta, sworn to on January 31, 1990, ¶ 6.

(1984) (*quoting Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971).[10] If Kane's activities are found to be violative of the fourth amendment, then the Court must suppress the fruits of the electronic surveillance, unless an exception to the exclusionary rule applies.

The March 9 order of Judge Costantino authorizes Special Agents of the FBI to enter covertly the Caffe to install the bugs. The relevant portion of the March 9 order states that:

> Special Agents of the FBI are hereby authorized to effect surreptitious entries into the subject premises, covertly and by breaking and entering, for the purpose of installing, maintaining and removing any electronic surveillance equipment to be used in accomplishing the interception of oral communications....

(G.Ex. 3, at 5). This passage is the equivalent of a search warrant in the permission it grants federal agents to enter private premises. Gambino argues that the above-quoted language is intended to allow only federal agents to enter the Caffe *and* to install the eavesdropping devices. Gambino claims that Kane's involvement in either of these activities is in contravention to Judge Costantino's explicit order and the fourth amendment.

■ There is no provision in Judge Costantino's order, however, which deals explicitly with the actual installation of eavesdropping devices inside the Caffe Giardino, and who is authorized to do so. (*See* G.Ex. 3). The Court interprets the above-quoted provision of the March 9 order as only relating to entry of the Caffe, not as requiring that only federal agents carry out the installation. As will be discussed further below, the Court does not believe that installation or maintenance of devices are

tasks exclusively relegated to federal agents by Title III. As long as the interception has been authorized pursuant to Title III, and any person entering private property for the purpose of installing surveillance devices is authorized to enter the property, either by warrant or otherwise, the Court does not perceive further constitutional or statutory requirements relating to the actual installation of the devices.

■ Judge Costantino's March 9 order is the equivalent of a warrant authorizing the electronic surveillance of the Caffe Giardino, and should be read in light of the guidelines for the execution of federal search warrants. Section 3105 of Title 18, entitled "Persons authorized to serve search warrants," provides that:

> A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such a warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.

It is clear that confidential informants cannot on their own execute federal search warrants, but may assist in the execution of warrants if in the presence of an authorized federal agent. *See United States v. Barnes*, 604 F.2d 121, 152 n. 16 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980) ("An informant, whether paid or not, is simply not a Government 'agent' within the meaning of search and seizure law."). The Court considers Kane in an intermediate status, acting as an instrument of the government for fourth amendment purposes, but not rising to the level of a *federal agent for the purposes of executing search warrants.*

An individual who exerts common authority over a certain premises may consent to the entry of government agents and permit those agents to search the premises. *United States v. Matlock*, 415 U.S. 164,

---

**10.** *See United States v. Bennett*, 729 F.2d 923, 925 (2d Cir.), *cert. denied*, 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984) ("It is also well established that unlawful acts performed by informants at the instance of Government officials may, for Fourth Amendment purposes, be treated as acts of the Government itself.... The Fourth Amendment precludes a law enforcement officer from having an informant do for him what he himself cannot do." (citations omitted)).

**1092**

171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1971); *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 123, 107 L.Ed.2d 84 (1989); *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981). Courts are in agreement that confidential informants and undercover agents, whose identity is unknown by the person exercising authority, may be granted consent to enter a premises. *See United States v. White*, 401 U.S. 745, 749, 91 S.Ct. 1122, 1124, 28 L.Ed.2d 453 (1971); *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966); *United States v. Santiago*, 828 F.2d 866, 869 (1st Cir.1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988). The Supreme Court "has repeatedly held that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976) (citations omitted); *see also United States v. Vargas*, 621 F.2d 54, 56–57 (2d Cir.), *cert. denied,* 449 U.S. 854, 101 S.Ct. 150, 66 L.Ed.2d 68 (1980) ("Even absent a warrant, stratagem or deception used to obtain evidence is generally permissible." (*citing Lewis v. United States, supra,* 385 U.S. 206, 208–09, 87 S.Ct. 424, 426)).

The government argues, and the Court agrees, that Giuseppe Gambino, who at the very least exerted common authority over the Caffe Giardino, consented to Kane's presence in virtually all parts of the Caffe. Kane testified that he had been given a set of keys by either Gambino or Lorenzo Mannino to the Caffe Giardino, which included a key to the front door, to Gambino's office in the basement, *and to* Gambino's desk inside the office. (Tr. 17–18, 60).[11] Kane also testified that he was in the Caffe Giardino on a daily basis from 1986 through 1988, and used Gambino's office and desk to count and divide money gathered from his video machines. (Tr. 18, 54). The Court therefore rules that Kane's presence inside the Caffe Giardino at any time during the period in question was constitutionally proper. Though Kane for much of the time was acting as an instrument of the government, he did not need a warrant of any type to enter or to be present in the Caffe at any time of night or day.

The central inquiry remaining for the Court is whether Kane, once he is legally inside the Caffe Giardino, needs further authority to install, to maintain or to replace electronic eavesdropping devices. The parties have not presented, nor has the Court itself found, any statutory or case authority which explicitly allows or disallows a confidential informant from installing eavesdropping devices, the use of which has been authorized by a court pursuant to Title III procedures. Title III does not contain provisions which limit the individuals who can actually carry out the installation of the devices. Similarly, the fourth amendment has never been interpreted to protect property owners against the installation of eavesdropping devices by those who have been granted full permission to enter the premises.[12]

---

**11.** In an affidavit submitted to the Court, however, counsel for Gambino asserts upon information and belief that Kane was never given keys to the Caffe by anyone with authority or a proprietary interest in the premises. Saporta Aff., ¶ 7. Such an assertion by counsel is of limited, if any, weight for purposes of these proceedings. *See Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983); *cf. Gatling v. Atlantic Richfield Co.,* 577 F.2d 185, 188 (2d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 169 (1978).

**12.** In *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), federal agents installed an electronic tracking device (a "beeper") inside a container of chemicals used in the fabrication of illegal drugs. This installation was carried out with the consent of the original owner of the chemicals, but the subsequent buyer of the chemicals was unaware of the beeper's presence. The Court ruled that the mere installation of the beeper in the chemical container did not infringe on the buyer's privacy interests. "To be sure, [the installation] created a *potential* for an invasion of privacy, but we have never

Gambino's two constitutionally protected privacy interests at issue—in his conversations inside the Caffe, and in the sanctity of the Caffe itself against entry—have both been weighed and protected by courts of law. Judge Costantino, in carefully following the requirements of Title III, determined that the government had made a sufficient showing to justify interception by government agents of Gambino's private conversations. Judge Costantino also gave permission to federal agents to enter the Caffe covertly for the purpose of installing eavesdropping devices. Finally, this Court has found that Kane was allowed by Gambino himself to enter the Caffe at will, and to use Gambino's office for his business affairs. Gambino has not articulated a separate constitutionally protected interest which prevented Kane from installing eavesdropping devices inside the Caffe.

The Court's ruling is based on a fair balancing of the competing policy concerns of fourth amendment jurisprudence. First, as just discussed, Gambino's privacy interests are not jeopardized by the fact that Kane, rather than federal agents, at certain times installed and maintained eavesdropping devices. *See Karo, supra,* 468 U.S. at 712–13, 104 S.Ct. at 3301–02. Second, the Court believes that prudent law enforcement policy requires that an informant in the position of Kane be allowed to install and maintain bugs. Under the circumstances, it was more safe and effective for Kane to undertake these activities, rather than rely on multiple covert entries by federal agents into the alleged headquarters of a criminal organization, purportedly with a penchant for murder and other acts of violence in carrying out its activities. Furthermore, Kane was always

closely supervised by federal agents operating in close proximity to the Caffe Giardino. (Tr. 22–24).[13] The Court concludes that the actions of the government and of Kane with regard to the installation and maintenance of the Caffe Giardino bugs were at all times legal.

**B. Reference to Gambling Offenses in the Judicial Orders**

■ Gambino argues that the government purposefully omitted any mention of gambling activities at the Caffe Giardino from its first eight applications for permission to conduct electronic surveillance. Only Judge Costantino's final extension order, issued November 18, 1988, states that probable cause existed to believe that illegal gambling activities were taking place at the Caffe. (G.Ex. 27, at 2–3). Gambino claims that the government's delay in seeking express permission to eavesdrop for evidence of gambling was a tactical decision to focus attention on alleged narcotics offenses, rather than less serious crimes. Gambino argues that the government delayed in bringing gambling to Judge Costantino's attention to foster the impression that references to large amounts of cash suggested involvement in the narcotics trade rather than merely gambling. Gambino also claims that Judge Costantino would not have consented to the length of the surveillance if he had known that gambling was in all probability the only crime that was being committed. Based on the government's bad faith in not disclosing evidence of gambling until November 18, 1988, Gambino argues that any evidence of gambling recorded prior to that date should be suppressed.

Gambino argues that the government's conduct runs afoul of Title III. By allow-

held that potential, as opposed to actual, invasions of privacy constituted searches for purposes of the Fourth Amendment.... Rather, any impairment of [the buyer's] privacy interests that may have occurred was occasioned by the monitoring of the beeper." *Id.* at 712–13, 104 S.Ct. at 3302.

**13.** Kane testified that on two occasions he plugged in bugs under instruction from FBI technical agents. (Tr. 23–24). Kane also testified that on another occasion he replaced an

entire unit which resembled a shoe box, and handed the defective unit over to the FBI immediately. (Tr. 23–26). Kane stated that on two occasions he plugged in a device inside Gambino's office, and on two occasions replaced equipment in Gambino's office, all under close supervision of the FBI. (Tr. 26–28). At all times, Kane carried a transmitter in order to remain in contact with FBI agents outside the Caffe if problems were encountered. (Tr. 24, 26, 27).

ing the government to use evidence of any crime intercepted via an authorization order specifying only certain offenses, "[t]itle III might rapidly degenerate into what Justice Clark recently termed 'the electronic equivalent ... of a "general search warrant." ' " *United States v. Marion,* 535 F.2d 697, 701 (2d Cir.1976) (*quoting United States v. Brodson,* 528 F.2d 214 (7th Cir. 1975)). Title III therefore requires that the government's omission of mention of gambling activities in its early applications were "inadvertent" and in good faith. *Marion, supra,* 535 F.2d at 701.[14]

Gambino also claims that the government's delay in bringing gambling to Judge Costantino's attention violates the precise language of § 2517(5). That section provides that when federal agents conducting electronic surveillance intercept evidence of crimes other than those specified in the authorization order, the government must include reference to the additional crimes "as soon as practicable" in a subsequent application.[15] In *United States v. Marion, supra,* 535 F.2d 697, the Second Circuit suggested a broad, "common-sense" reading of this language, stating that "[i]n all events, however, approval of the serendipitous interceptions must be obtained *before* their contents or fruits are used, pursuant to § 2517(3), in any criminal or grand jury proceeding." *Id.* at 704 n. 14, 707; *United States v. Levine,* 690 F.Supp. 1165, 1172 (E.D.N.Y.1988) (emphasis in original) (stating that prosecutors should be given a reasonable amount of time in which to decide whether they will at some time use the intercepted evidence of new crimes).

The First Circuit has held that a nineteen-month period between the interceptions of evidence of new crimes and the government's application for permission to use them as evidence did not violate § 2517(5). *United States v. Southard,* 700 F.2d 1, 30 (1st Cir.), *cert. denied sub nom. Ferris v. United States,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). The government argued in that case that the relevance of the intercepted conversations had only become apparent upon further analysis. *Id.* The First Circuit noted that the defendant had not alleged any prejudice due to the delay, and that there was no evidence that the government was engaging in "subterfuge" in an effort to manipulate the proceedings and to avoid the protections afforded the public by Title III. *Id.* at 30–31.

Gambino has presented a conjectural theory of government subterfuge in not bringing gambling to Judge Costantino's attention until November 1988, eight months after the initial application. Aside from the speculations voiced in his memoranda of law, however, Gambino has no evidence

---

**14.** There is a dispute between the parties over whether the interception of evidence related to gambling activities must be "inadvertent" or "incidental." Gambino argues that the "inadvertence" standard alluded to in *Marion* requires that the government show that it had no expectation of intercepting the evidence, and that if it did have such an expectation but did not reveal it, the evidence must be suppressed. The government, relying on the legislative history of Title III as quoted in *Marion,* argues that the interception must merely be made "incidentally" and "in good faith." *Marion, supra,* 535 F.2d at 700. The Court finds it unnecessary to become enmeshed in a question of semantics. For purposes of disposing of the instant motion, the Court will admit the evidence of gambling (absent a future valid objection) as long as the government had a good faith intention to prosecute the crimes alleged in the initial application—that is, the narcotics offenses. *United States v. McKinnon,* 721 F.2d 19, 22 (1st Cir. 1983); *United States v. Levine,* 690 F.Supp. 1165, 1170 (E.D.N.Y.1988).

**15.** Section 2517(5) provides that:
[w]hen an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section [regarding disclosure to fellow law enforcement officers and use in performing official duties]. Such contents and any evidence derived therefrom may be used under subsection (3) [regarding use in proceedings] of this section when authorized or approved by a judge of competent jurisdiction where such judge finds, on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as possible.

to substantiate his claims. Based on a careful review of the prior developments in this matter, it is apparent to the Court that the government has proceeded throughout this investigation with a good faith belief that the defendants in this prosecution are primarily narcotics traffickers. It is expected, therefore, that the early applications for court permission to eavesdrop dealt exclusively with alleged narcotics offenses. There is little to support Gambino's allegation that Judge Costantino would only have permitted extended surveillance if narcotics were involved, and that the government manipulated the proceedings by focusing on narcotics rather than gambling.

The Court also rests its holding on a theory of implied authorization. The Second Circuit has held that authorization under § 2517(5) "may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as he was made aware of 'material facts constituting or clearly relating to [the] other offenses' in the application for the continuance." *United States v. Ardito*, 782 F.2d 358, 362 (2d Cir.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986) (*quoting United States v. Masciarelli*, 558 F.2d 1064, 1067–68 (2d Cir.1977)). Judge Costantino was made aware on at least two occasions prior to the government's November application that evidence of gambling at the Caffe Giardino was being intercepted by government investigators. (*See* Affidavit of Special Agent John G. Nemec, Jr., sworn to July 15, 1988 (G.Ex. 14, at 25); Affidavit of John G. Nemec, Jr., sworn to on October 14, 1988 (G.Ex. 23, at 30)). This evidence shows that Judge Costantino knew about gambling at the Caffe Giardino, and that his permission to collect evidence related to gambling may be inferred in his authorization orders beginning in July 1988. Also, this evidence casts serious doubt on Gambino's theory of government subterfuge. For these reasons, the Court holds that the government may use evidence of gambling activities intercepted via the Caffe Giardino bugs both before and after the November 18, 1988 authorization order.

## C. Alleged Non–Disclosure of Prior Government Surveillance

■ Gambino alleges that the Caffe Giardino was bugged by the FBI prior to March 1988, and that this fact was not disclosed to Judge Costantino in violation of Title III. Section 2518(1)(e) of Title III requires that the government disclose any prior applications for electronic surveillance of a particular person or location to the issuing judge. The importance of such a requirement is clear: the issuing judge should be made aware of all prior applications and orders, their foundations, their ultimate validity, and the fruits seized pursuant to them. This information would be central to the issuing judge's determination of probable cause as required by Title III. *See United States v. Bellosi*, 501 F.2d 833, 841 (D.C.Cir.1974). Gambino claims that the government acted in bad faith in not disclosing prior electronic surveillance at the Caffe, and that Judge Costantino's March 9, 1988 order was therefore invalidly issued.

The *Courier–Post* article of March 13, 1989 states that "[o]n September 13, 1987, Kane opened the door of the Caffe Giardano [sic] to two FBI technicians, who he could say were helping move some vending machines." (G.Ex. 57). The article continues to state that the FBI agents then installed a listening device over the favorite table of Giovanni Gambino, Giuseppe Gambino's brother. Gambino argues that if the date of the installation is correct, the affidavits submitted in support of the government's application to bug the Caffe were fatally incomplete, if not intentionally false.

The article on its face, however, is factually inconsistent. Soon after the mentioning the supposed 1987 installation, and seemingly in reference to that installation, the article states that "[the FBI] began taping conversations inside the Caffe Giardino on the fifth day of the court order.... Those initial conversations persuaded federal judges to allow the FBI to keep its bugs and wiretaps at Caffe Giardino running almost continuously for three years."

(G.Ex. 57). First, the article states quite explicitly that the FBI did not commence interceptions until *after* court authorization, which belies the 1987 date. Second, the article says that federal judges authorized interceptions for a three-year period, which is untrue. Judge Costantino's authorization orders for electronic surveillance inside the Caffe Giardino ran from March through November 1988, a period of nine months. The Court must find that this assertion in the article that bugs were installed inside the Caffe Giardino in 1987 is untrustworthy.

Kane testified on direct examination before the Court that while it was true that he did assist two FBI agents in entering the Caffe, he knew nothing about the date of the entry and had not entered the Caffe with the FBI on September 13, 1987. (Tr. 30–31). Kane further testified that he never assisted the FBI in bugging the Caffe prior to 1988. (Tr. 29). Kane also testified that in general he thought the articles were not factually accurate. (Tr. 30). On cross-examination, Kane indicated that he "might have made that date up." (Tr. 38).

The *Courier–Post* articles also state that Kane installed listening devices in video games which he managed in the Caffe Giardino. "Kane's video poker machines proved to be a good place to put listening devices. Beginning in 1986, they became a confessional for mafia crimes." (G.Ex. 57). Under cross-examination, Kane denied ever having video poker machines inside the Caffe Giardino. (Tr. 45). Kane stated that he did not know if there were bugs inside his other vending machines (Tr. 47), but that he had falsely told the *Courier–Post* reporter that his machines contained bugs. (Tr. 48–49).

The government strongly contests that any surveillance of oral communications inside the Caffe Giardino took place prior to March 1988. In its initial application for authorization, the government stated that two telephones inside the Caffe had been bugged, but that "[t]o our knowledge there have been no previous applications to intercept oral communications within the subject premises." (G.Ex. 1, at 5). The government denies any truth to the allegations contained in the newspaper articles that the Caffe Giardino was bugged for three years starting well before March 1988.

Special Agent John Meighan of the FBI, who was the administrative agent for the electronic surveillance paperwork for the Caffe Giardino investigation, also testified before the Court. At the time of the government's application for surveillance authorization in early 1988, Special Agent Meighan had requested a search through the relevant ELSUR files [16] at FBI headquarters in Washington, D.C. to disclose prior electronic surveillance at the Caffe Giardino premises. After reviewing the results of that search, Special Agent Meighan determined that "there had not been previous electronic surveillance at the Caffe Giardino." (Tr. 152-54).[17]

In applying the law to the facts as they have been developed, the Court must keep its central inquiry in mind: does the evidence show that electronic surveillance devices were installed and activated in the Caffe Giardino prior to March 1988, and does such undisclosed prior eavesdropping mandate suppression of the tapes? Gambino's claims that the Caffe was bugged prior to 1988 implicate the FBI as well as Kane, in a scheme actively to mislead Judge Costantino by not disclosing the prior eavesdropping. The Court has received the testimony from two FBI agents—Special Agent Nemec in his affidavit, and Special Agent Meighan in live testimony—that no bugging took place at the Caffe Giardino prior to March 1988. This testimony satisfies the Court for purposes of this motion that the Caffe was not bugged prior to the authorized surveillance commenced

---

**16.** The FBI's ELSUR files (electronic surveillance files) list all prior electronic surveillance known to any FBI field office using three indexes: by location, by address, and by name of the targeted individual. (Tr. 153).

**17.** The ELSUR files did indicate that the premises now occupied by the Caffe Giardino had been the subject of FBI electronic eavesdropping while under a different name, the Caffe Milano, in February and March of 1984. (Tr. 154–55).

pursuant to Judge Costantino's March 9 authorization order.

The Supreme Court has ruled that the exclusionary rule is not a necessary corollary to the fourth amendment, and that evidence seized by law enforcement officers acting in good faith reliance on a warrant should not be suppressed. *United States v. Leon*, 468 U.S. 897, 905–06, 922–23, 104 S.Ct. 3405, 3411–12, 3420–21, 82 L.Ed.2d 677 (1984); *see also United States v. Buck*, 813 F.2d 588, 592 (2d Cir.1987). The principal rationale for this exception to the exclusionary rule is that suppression of evidence seized in good faith does not deter future police misconduct. *Leon, supra*, 468 U.S. at 918–21; *Buck, supra*, 813 F.2d at 592. Even when the defendant argues that statements in the affidavit supporting the government's application for a warrant were false or recklessly made, good faith reliance by the executing officers on the warrant will preclude suppression. *United States v. Carmona*, 858 F.2d 66, 68 (2d Cir.1988).

There is no evidence that the government agents who executed Judge Costantino's March 9 order—by entering the Caffe Giardino to plant bugs, and by conducting actual interceptions of conversations within the Caffe—did not act in objective, good faith reliance on the March 9 order. The order and its supporting affidavits are facially proper in every way. Based on the evidence before the Court, the purpose of the exclusionary rule would not be fulfilled by suppression of the tapes.

### D. Applications Supported By Probable Cause

#### 1. Legal Dispute

Gambino argues that this Court should conduct a *de novo* review of the government's application for permission to bug the Caffe Giardino, and that a heightened standard of probable cause is necessary when authorizing electronic surveillance. The government argues in response that this Court should act with deference to the findings of the issuing court, and that the same standard of probable cause applies for search warrants as for orders authorizing electronic surveillance.

■ In *United States v. Biaggi*, 853 F.2d 89 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989), the Second Circuit ruled in the context of electronic surveillance authorization orders issued pursuant to Title III that "a reviewing court will defer to the issuing court's determination that there was probable cause 'as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrongdoing.' " *Id.* at 95 (*quoting United States v. Nersesian*, 824 F.2d 1294, 1306 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987)); *see United States v. Gallo*, 863 F.2d 185, 191 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989) (*citing Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (ruling in the context of a standard search warrant, the Supreme Court "paid great deference" to issuing courts)); *United States v. Martino*, 664 F.2d 860, 867 (2d Cir.1981), *cert. denied sub nom. Miller v. United States*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (citations omitted). There is no holding in either the Supreme Court or the Second Circuit which requires, or even suggests, that courts reviewing the issuance of electronic surveillance authorization orders should conduct a *de novo* inquiry.

■ The Second Circuit has also clearly ruled that the quantum of probable cause needed for an electronic surveillance authorization order to issue is identical to that for a standard search warrant. *United States v. Biaggi, supra*, 853 F.2d at 95; (*citing United States v. Fury*, 554 F.2d 522, 530 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978)); *United States v. Gallo, supra*, 863 F.2d at 191; *United States v. Persico*, 621 F.Supp. 842, 861 (S.D.N.Y.1985); *United States v. Shipp*, 578 F.Supp. 980, 985 (S.D. N.Y.1984) (Weinfeld, J.), *aff'd*, 754 F.2d 1427 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). The text of Title III does not lend support to Gambino's position either, as the statute

merely states that the issuing judge or magistrate must find probable cause to believe that evidence of the specified crime will be discovered through electronic surveillance, with no reference to a heightened standard. *See* 18 U.S.C. § 2518(3).

Gambino concedes that his positions are not supported by current caselaw, but he argues strenuously that the Second Circuit's posture is incorrect on these issues, given repeated judicial warnings concerning the intrusiveness of electronic surveillance. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1966); *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *United States v. Marion, supra*, 535 F.2d at 700; *United States v. Falcone*, 505 F.2d 478 (3rd Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975); *United States v. Mancari*, 663 F.Supp. 1343, 1354–55 (N.D.Ill.1987). Gambino points out that none of the Second Circuit opinions have discussed in detail the theoretical and policy foundations of Title III, and, indeed, that those foundations mandate *de novo* review, requiring a heightened level of probable cause.

The policy arguments of counsel for Gambino with respect to Title III considerations have surface appeal but on analysis are not persuasive. This Court does not hesitate to follow the teaching of the higher courts which have greater expertise and authority in considering policy-based legal arguments. Indeed, much of the concern expressed in Gambino's papers over the vulnerability of individuals to modern electronic surveillance technology has been addressed by Title III itself. As a particular response to public concern over electronic surveillance, Congress passed Title III to regulate closely the circumstances under which bugging can take place. No similarly detailed procedures exist to obtain standard search warrants. By closely adhering to the safeguards set out in Title III,

courts can afford the public the heightened protection that it needs.

Consideration of the body of law that has developed with respect to search warrants is, of course, instructive. Probable cause in a search warrant must be "sufficient to warrant a prudent man in believing" that evidence of a crime could be obtained through execution of the warrant. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The Supreme Court has employed a totality of the circumstances approach, rather than any specific legal test, to determine whether a warrant was properly supported by probable cause. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983).[18] " 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. They are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.' " *Id.* at 231, 103 S.Ct. at 2328 (*quoting Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)). "[F]acts ostensibly sufficient to establish probable cause ... are not negated simply because such facts also may be consistent with the suspect's innocence." *United States v. Webb*, 623 F.2d 758, 761 (2d Cir.1980).

Affidavits in support of an application for a search warrant should be read as a whole and construed in a realistic, commonsense manner so that their purpose is not frustrated. *United States v. Harris*, 403 U.S. 573, 577–79, 91 S.Ct. 2075, 2078–80, 29 L.Ed.2d 723 (1971); *see United States v. Young*, 745 F.2d 733, 758 (2d Cir.1984), *cert. denied sub nom. Myers v. United States*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Affidavits should not be read "with the same microscopic intensity as municipal bond counsel would a bond indenture." *United States v. Pond*, 523 F.2d 210, 214 (2d Cir.1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649

---

18. *Illinois v. Gates* rejected the formal two-part test of *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which required that the government had to establish both the "basis of knowledge" of informants, and their veracity and reliability, before relying on informant testimony. *Id.* at 416, 89 S.Ct. at 589; *see also United States v. Feliz–Cordero*, 859 F.2d 250, 252–53 (2d Cir.1988).

(1976). Even if portions of an affidavit are "tainted" by their reliance on illegally obtained or suspect evidence, the Court should put aside that information and determine the existence of probable cause based on independent and lawfully obtained evidence. *United States v. Whitehorn,* 829 F.2d 1225, 1231 (2d Cir.1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988) (*citing United States v. Lace,* 669 F.2d 46, 49 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982)).

## 2. Factual Dispute

■ The affidavit of Special Agent John G. Nemec, Jr. is based on his own personal involvement in the investigation of the alleged narcotics conspiracy, and his review and analysis of "numerous reports and communications regarding present and prior investigations by Special Agents of the FBI and other law enforcement officers pertaining to the activities of GIOVANNI GAMBINO, a/k/a 'John', and 'Gio', GIUSEPPE GAMBINO, a/k/a 'Joe'" and other defendants in this case. (Nemec Aff., G.Ex. 2, at 6). Up until March 1988, the bulk of the investigation had been into the activities of the so-called Sicilian mafia in Philadelphia and southern New Jersey. Nemec admits that the organization that the FBI was investigating was "vast," involving more than fifty co-conspirators and operating all along the East Coast from New York to Virginia. (Nemec Aff., at 13–14). But he specifically identifies Giuseppe Gambino as "overseeing [one particular] importation plan" and the Caffe Giardino "as an office and meeting place in which [the conspirators] conduct their illegal activities." (Nemec Aff., at 15–16).

The affidavits of Special Agent Nemec and Special Agent Hayes, incorporated by reference, contain little direct evidence of Giuseppe Gambino's involvement in narcotics trafficking. However, the circumstantial evidence of Gambino's illegal activities is substantial and compelling. In addition, the information supplied by confidential informants, though often hearsay, is weighty and consistent with other evidence. Though courts prefer direct evidence whenever possible, the circumstances of this case dictate that these types of evidence be acceptable. Given the far-flung nature of the alleged conspiracy, and the great awareness of its members of security concerns, courts must be willing to rely on circumstantial evidence, hearsay statements of confidential informants, and the professional opinions of law enforcement officers. (On conspirators' security consciousness, *see* Nemec Aff., at 14, 36–37, 62); *see United States v. Benevento,* 836 F.2d 60, 71 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988) ("a government agent's expert opinion ... is an important factor to be considered by the judge when making a probable cause determination" (*quoting United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985))); *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987).

Gambino's activities, as recounted by Nemec, should be viewed in light of Gambino's close association with convicted narcotics traffickers and his own prior encounters with the law. As the government points out,

> many of Gambino's confederates named as interceptees and potential interceptees in the Caffe Giardino application have already entered guilty pleas (Salvatore Rina, Giovanni Zarbano, Pietro Candela), been convicted (Francesco Gambino, Ignazio Antonio Mannino, Salvatore Mannino) or become fugitives (Simone Zito, Salvatore Inzerillo, Rosario Naimo) due to narcotics trafficking charges.

Government's Memorandum of Law in Opposition to Defendants' Title III Motions, at 13 n. *. There is considerable direct evidence of narcotics trafficking by many of Gambino's close associates in Nemec's affidavit. (Nemec Aff., at 20–21, 27, 30–31, 37–40). Both Giuseppe Gambino and his brother Giovanni Gambino have been convicted *in absentia* in Italy on drug-related charges. (Nemec Aff., at 63). Giuseppe Gambino was indicted but acquitted on a narcotics-related charge in New York in 1981.

In one particular instance, Simone Zito sold seven ounces of heroin to a confiden-

tial informant in October 1987. (Nemec Aff., at 20). Zito has been observed by a confidential informant on at least two occasions inside the Caffe Giardino meeting with Giovanni and Giuseppe Gambino. On May 27, 1987, the confidential informant observed Zito meet with Giuseppe Gambino in the basement of the Caffe, where approximately $70,000 in twenty dollar bills was lying on a table. (Nemec Aff., at 27). By March 1988, the confidential informant had sensed friction between Zito and the Gambino brothers, though Nemec "believe[d] GIOVANNI and GIUSEPPE GAMBINO and SIMONE ZITO still work together in the heroin importation business." (Nemec Aff., at 24).

Through the use of telephone bugs prior to 1988, the FBI intercepted many conversations by Gambino and others concerning the so-called "wine matter." The parties strongly dispute whether the "wine matter" refers to a legitimate wine importation matter, or a covert scheme to smuggle heroin in liquid form into the United States through the Dominican Republic.[19] Special Agent Nemec states that Giuseppe Gambino was overseeing the plan, that Gambino's brother-in-law, Tommaso Inzerillo, had been stationed in Santo Domingo, D.R., and that other conspirators were working to export the heroin from Italy. (Nemec Aff., at 15–16, 18–19). Both Giuseppe Gambino and Lorenzo Mannino travelled to the Dominican Republic during 1987. (Nemec Aff., at 18). Many telephone calls have been intercepted between Gambino and other alleged conspirators, and amongst others closely associated with Gambino, concerning the "wine matter." (Nemec Aff., at 16–17, 19, 41–48).

Special Agent Nemec's affidavit focuses on the activity of the alleged conspirators inside the Caffe Giardino. (Nemec Aff., at 24–37). From the personal observations of confidential informants and the intercepted telephone calls into the Caffe prior to 1988, it is clear that Giuseppe Gambino, Giovanni Gambino, Lorenzo Mannino, and others met constantly in the Caffe. Confidential informant Kane reported that the Gambino brothers and Mannino "freely talk about their illegal activities in the Sicilian language." (Nemec Aff., at 32–33). Their associates, many of whom are involved in drug trafficking in the Philadelphia area, are called into the Caffe frequently for meetings with the Gambino brothers. (Nemec Aff., at 24–26). In April 1987, John Gotti, reputed head of the New York City Gambino crime family, visited Giuseppe Gambino at the Caffe. (Nemec Aff., at 34). Kane at one time observed Giuseppe Gambino and fugitive Simone Zito in the basement of the Caffe with approximately $70,000 in twenty-dollar bills. (Nemec Aff., at 27). Kane also found cocaine in the drawer of Giuseppe Gambino's desk in the Caffe on September 26, 1987. (Nemec Aff., at 31–32). Nemec also details the drug-related activities of Lorenzo Mannino which are centered in the Caffe. (Nemec Aff., at 29–31). Mannino and five of his friends are allegedly involved in a cocaine distribution business. (Nemec Aff., at 30–31).

The Court considers the evidence contained in the Nemec affidavit legally sufficient to establish probable cause to conduct electronic surveillance of the Caffe Giardino. Special Agent Nemec's sworn allegations are consistent with the operation of a large-scale narcotics importation and distribution conspiracy. The affidavit also establishes that the Caffe Giardino is the focal point of Gambino's activities, and that an issuing court could reasonably believe that evidence of narcotics trafficking could

---

**19.** The Second Circuit "has repeatedly held" that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Ev. 702. *United States v. Tutino,* 883 F.2d 1125, 1134 (2d Cir.1989) (citations omitted). Thus a government agent may testify as an expert on the proper interpretation of coded messages, *United States v. Levasseur,* 816 F.2d 37, 45 (2d Cir.1987), or the meaning of coded language related to narcotics. *United States v. Carmona,* 858 F.2d 66, 69 (2d Cir.1988) (per curiam). Even in the absence of expert testimony, it has been found permissible for the government to argue that the jury should infer "that the recorded statements were coded orders not for bread and chicken but rather for the inventory [the defendant] had on hand, namely cocaine." *United States v. Giraldo,* 822 F.2d 205, 213 (2d Cir.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987).

be collected through interception of oral conversations inside the Caffe. Gambino's motion to suppress the fruits of the electronic surveillance for lack of probable cause is denied.

### E. The Necessity of Electronic Surveillance

■ Gambino argues that the government did not establish the necessity of electronic surveillance in conducting its investigation of the defendants. Section 2518(3)(c) of Title III requires that the issuing judge determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous." As with other provisions of Title III, § 2518(3)(c) should be construed in a "common sense and realistic fashion." *United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

The Second Circuit has ruled that:

" 'the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the normal law enforcement methods.' "

*United States v. Torres*, 901 F.2d 205, 231 (2d Cir.1990) (*quoting United States v. Vasquez*, 605 F.2d 1269, 1282 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979) (*quoting United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976))); *see also United States v. Terry*, 702 F.2d 299, 310 (2d Cir.), *cert. denied sub nom. Williams v. United States*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Judge Weinfeld has written that "Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to what they did employ is utterly unrealistic, if not naive." *United States v. Shipp, supra,* 578 F.Supp. at 989. "Section 2518 'is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' " *United States v. Torres, supra,* at 231 (*quoting United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974)).

Special Agent Nemec clearly spells out the need for electronic surveillance. (*See* Nemec Aff., at 51–63). He states that the organization under investigation is extremely covert, secretive, and difficult to penetrate. (Nemec Aff., at 51–52, 62). Though some confidential informants have been willing to testify, many fear for their personal safety, and others would be expected to invoke the fifth amendment on the witness stand. (Nemec Aff., at 52–53). The use of undercover agents is unlikely to succeed due to the difficulty of penetrating the organization from the outside. (Nemec Aff., at 59). Conventional searches for tangible evidence are similarly unrealistic due to the difficulty of predicting where narcotics will be at any given moment. (Nemec Aff., at 58–59). Special Agent Nemec believed that electronic surveillance was "the only available investigative method remaining which has a reasonable likelihood of securing the evidence, and the leads to evidence...." (Nemec Aff., at 62). The Court finds that the Nemec affidavit was entirely adequate and sufficient to establish the need for electronic surveillance of the Caffe Giardino.

### F. Failure to Obtain Timely Extension Orders

■ At one instance during the eight-month surveillance of the Caffe Giardino, the government did not timely apply for an extension of the initial March 9 authorization order. Title III only permits authorization orders to last for thirty days. 18 U.S.C. 2518(5). On October 14, 1988, Judge Costantino signed an extension order which was to go into effect on October 16 and last thirty days until November 15, 1988. (*See* G.Ex. 24). The government did not receive the next extension from Judge Costantino until November 18, 1988, three days after the prior order had expired. (*See* G.Ex. 27). Thus a three-day gap existed during

which the government had no authority pursuant to Title III to bug the Caffe Giardino. During this period, however, the government turned off its monitoring devices and made no interceptions at the Caffe Giardino.

Nothing in Title III requires that the government secure extension orders prior to the expiration of the preceding order. Thus time gaps may exist between periods of authorized surveillance, so long as the government turns off all listening devices during those gaps, and the defendant does not suffer prejudice from the time gap. The New York wiretapping statute may indeed be different, but that issue of law is not before the Court. *See People v. Gallina,* 66 N.Y.2d 52, 57–58, 495 N.Y.S.2d 9, 10–12, 485 N.E.2d 216 (1985). In the case at bar, the time gap was small indeed, the government turned off all listening devices during that period, and Judge Costantino was well aware of the circumstances. Gambino's motion that the recordings made after the time gap be suppressed is denied.

### G. Minimization Requirements

■ Gambino argues that the government's failure to provide a Sicilian interpreter at the time that oral communications were being intercepted violates the fourth amendment's mandate that all searches be conducted so as to minimize intrusiveness and focus on the collection of evidence of criminal activity. "[A] determination as to whether minimization has been complied with requires an assessment of the reasonableness of interceptions in light of the purpose of the wiretap and the totality of the circumstances of each case." *United States v. Napolitano,* 552 F.Supp. 465, 476 (S.D.N.Y.1979) (*citing Scott v. United States,* 436 U.S. 128, 130, 98 S.Ct. 1717, 1719, 56 L.Ed.2d 168 (1978)).[20]

The Court finds that not having a Sicilian translator on constant duty monitoring the interceptions did not violate the fourth amendment. As will be discussed below with regard to Francesco Inzerillo's suppression motion, the Court believes that the FBI's process of post-interception minimization is justified due to the expense and delay of securing a Sicilian translator at all times. Minimization is effected, if belatedly, and the privacy interests of the defendants are thereby protected.

## II. SALVATORE LOBUGLIO'S MOTION

Defendant Salvatore LoBuglio moves the Court to suppress evidence seized by the government by wiretapping three telephones in the New York City area. LoBuglio argues that the government failed to show (1) that normal investigative procedures would be unsuccessful, (2) that there was probable cause to believe that LoBuglio would be engaging in narcotics-related offenses, (3) that the telephones in question would be used for communications concerning narcotics, and (4) that the surveillance tapes, in some instances, were timely sealed. Finally, LoBuglio claims that other evidence seized by the government as a result of these unlawful wiretaps—to wit, physical evidence seized from LoBuglio's house and electronic surveillance of the Caffe Giardino—should be suppressed.

### A. Government Wiretap of (718) 259–0122

■ On October 20, 1988, Judge Costantino granted the government's application to intercept wire communications over the telephone number (718) 259–0122, subscribed to by Dots Design & Construction Co., LoBuglio's business. LoBuglio claims that the government did not show that "normal investigative procedures have

---

**20.** The government argues, and the Court agrees, that due to the circumstances of this case—the far-flung nature of the conspiracy, the large number of conspirators, and the codes used by conspirators—wide latitude should be allowed in enforcing the minimization requirement. The First Circuit has ruled that:

[w]here ... an investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying the spokes radiating from its hub, the need to allow latitude to eavesdroppers is close to its zenith. The need is but heightened because the conspiracy involves controlled substances—easily concealed, easily transported, likely to implicate international or at least interstate interests. *United States v. Hoffman, supra,* 832 F.2d at 1308.

been tried and have failed or reasonably appear to be unlikely to succeed if tried" as required by Title III. 18 U.S.C. § 2518(3)(c). As discussed above, the statutory requirement should be construed in a realistic, common-sense manner, and not as requiring the government to show that evidence cannot be gathered in any way aside from electronic surveillance. *See United States v. Torres, supra,* at 230–31; *United States v. Ruggiero, supra,* 726 F.2d at 924; *United States v. Vasquez, supra,* 605 F.2d at 1282; *United States v. Shipp, supra,* 578 F.Supp. at 989. The government must simply "provide some basis for concluding that less intrusive investigative procedures are not feasible." *United States v. Lilla,* 699 F.2d 99, 103 (2d Cir.1983).

The Court finds that the affidavit in support of the application for the wiretap of (718) 259–0122 sufficiently demonstrated the need for wiretap surveillance in fulfillment of 18 U.S.C. § 2518(3)(c) (Affidavit of Richard S. Demberger, sworn to in October 1988, ¶¶ 68–86). Just because the government had achieved some success in collecting evidence through informant Giovanni Zarbano and undercover infiltration of the alleged conspiracy, does not demonstrate the success of "normal investigative procedures" under Title III. In fact, the affidavit repeatedly references the difficulty of investigating a covert and secretive organization such as the alleged conspiracy in this case. (October Demberger Aff., ¶¶ 69, 73, 82, 84). Due the large size and scope of the alleged conspiracy, the government's asserted need for wiretap surveillance is justified. The Court will not create a rule which requires the government to show that no other investigative techniques have made any progress in collecting evidence of the alleged criminal activity. *See United States v. Terry, supra,* 702 F.2d at 310 (holding that the government need not show that every other possible means of investigation has been exhausted).

**B. Government Wiretap of (718) 234–9225**

■ LoBuglio claims that the affidavit submitted in support of the government application to wiretap the telephone sub-

scribed to by Concorde Furniture, the business of defendants Matteo Romano and Salvatore D'Amico, failed to fulfill several of the requirements of 18 U.S.C. § 2518. More specifically, LoBuglio argues that the affidavit did not establish probable cause to believe that LoBuglio was involved in narcotics trafficking, that evidence of narcotics trafficking would be secured through a wiretap of the Concorde Furniture telephone line, and that Concorde Furniture would be used in connection with the alleged narcotics transactions. LoBuglio also claims that the wiretap recordings were not timely sealed in accordance with 18 U.S.C. § 2518(8)(a).

On March 31, 1988, the government searched Concorde Furniture pursuant to a warrant issued by Judge Costantino. No mention of the impending search was made in the application for a wiretap on the Concorde Furniture phone granted by Judge Costantino on March 30. LoBuglio argues that if Judge Costantino had known of the impending search, he would not have found probable cause to believe that the conspirators would use the telephone in Concorde Furniture for narcotics trafficking, so soon after the premises had been searched.

The Court is concerned that the application for the wiretap did not mention the upcoming physical search of Concorde Furniture, and believes that non-disclosure of such a fact threatens the interests of LoBuglio which are protected by both § 2518(3)(b) and (c). However, this omission does not cause suppression under Title III. Judge Costantino took no steps to vacate his wiretap surveillance order upon receiving an application for a search warrant, which indicates that he was confident that both government intrusions were justified and constitutionally and statutorily permissible. Given the lack of a precise showing how the two applications came to Judge Costantino, the Court will not invalidate the prior orders.

■ During April 1988, in a related government investigation employing a wiretap over (212) 463–8187 (a telephone

number subscribed to by Rocco Ambrosio, Inc., discussed *infra*), the government intercepted conversations amongst alleged narcotics traffickers, one of whom was suspected to be Salvatore D'Amico, that telephones should no longer be used to communicate concerning drug deals. Soon thereafter, the government ceased wiretap surveillance of (212) 463–8187. None of this information was included in the periodic reports or applications for extensions filed with Judge Costantino for the Concorde Furniture wiretap. LoBuglio argues that since D'Amico is an employee of Concorde Furniture, and the two groups of alleged traffickers are closely related, such evidence destroys probable cause to believe that evidence of criminal activity would be collected over the Concorde Furniture telephone line. LoBuglio also argues that the government omissions were either intentionally fraudulent or recklessly made, mandating an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Again, the Court is concerned that such information was not disclosed to Judge Costantino, who was under a continuing responsibility to evaluate the probable cause requirements of the Concorde Furniture wiretap pursuant to Title III. However, given the strong basis of probable cause provided by the Demberger affidavits, especially concerning the importance of wiretaps in the government's investigation and the history of telephone usage by the defendants, the Court will not rule that Judge Costantino's authorization orders were invalidly issued. LoBuglio has not made a sufficient showing of a close relationship between the group of traffickers using the Rocco Ambrosio telephone and the Concorde Furniture group to suggest fraud or recklessness on the part of the government in not disclosing the fruits of the Rocco Ambrosio wiretap to Judge Costantino.

■ LoBuglio attacks the validity of the authorization extension orders signed by Judge Costantino on May 11, June 10, and July 8, 1988 on a variety of grounds. LoBuglio's central argument is that the extension orders were authorized despite the paucity of evidence collected in the first months of the wiretap. The government argues, and the Court agrees, that the past success of the wiretap is but one factor in determining whether probable cause continued to exist that evidence might be gathered in the future. Given all the circumstances discussed above, especially the use of the telephone in the past to discuss narcotics, probable cause did exist for all extensions of the Concorde Furniture wiretap authorization order.

■ LoBuglio argues that the tape recordings of the Concorde Furniture wiretap were not timely sealed and thus should be suppressed. Section 2518(8)(a) provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his direction." The Second Circuit has ruled that "one or two days is generally sufficient to carry out the sealing process." *United States v. Ojeda Rios*, 875 F.2d 17, 20 (2d Cir.1989) (*citing United States v. Vasquez, supra*, 605 F.2d at 1278). If the tapes are not sealed within this time, the government must provide a " 'satisfactory explanation' " for the delay to the court. *Ojeda Rios, supra*, 875 F.2d at 20 (*quoting United States v. Gigante*, 538 F.2d 502, 507 (2d Cir.1976)); *see also United States v. Massino*, 784 F.2d 153, 158 (2d Cir.1986). Administrative problems, holidays, good faith efforts by government officials, lack of prejudice to the defendant, and lack of evidence of tampering with the tapes have been considered satisfactory in excusing delay in sealing wiretap tapes. *See United States v. Kusek*, 844 F.2d 942, 946 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988); *United States v. Ardito*, 782 F.2d 358, 362–63 (2d Cir.), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1792,. 90 L.Ed.2d 338 (1986).

The Court finds no inexcusable delay in sealing any of the recordings made on the Concorde Furniture wiretap. In only one instance did the government fail to seal the tapes within two days of the termination of

the wiretap authorization period, and, in that case, the government was late by only one day. Agent Demberger, who was responsible for sealing the tapes, has submitted an affidavit to the Court stating that the one-day delay was due to his assignment to a surveillance team including the Buffalo undercover agent and confidential informant who were temporarily in New York. (Affidavit of Richard S. Demberger, sworn to on January 16, 1990, ¶¶ 5–6 (Govt.Ex. 5)). This explanation is satisfactory to the Court given the small delay and lack of evidence of prejudice to the defendant. LoBuglio's motion to suppress the Concorde Furniture wiretap recordings for failure to seal the tapes in a timely fashion is denied.

### C. Government Wiretap of (212) 463–8187

On February 16, 1988, Judge Richard Owen of the Southern District of New York signed an order authorizing a wiretap on the phone of Rocco Ambrosio, Inc., a clothing store in Manhattan allegedly owned and operated by narcotics traffickers. The government's application for the authorization order was supported by the affidavit of Special Agent Demberger. LoBuglio claims that Judge Owen improperly authorized the Rocco Ambrosio wiretap, as the government had not sufficiently demonstrated that normal investigative procedures had failed or appeared unlikely to succeed in violation of 18 U.S.C. § 2518(3)(c). LoBuglio states that "[c]learly, the government had full access to the named targets and their places of business." On one occasion, Special Agent Demberger was able to enter the clothing store and converse with one of the owners and suspected traffickers.

As previously stated, § 2518(3)(c) does not require the government to demonstrate to the issuing judge the complete ineffectiveness of all investigative techniques aside from electronic surveillance. *United States v. Lilla, supra,* 699 F.2d at 102–03; *United States v. Vasquez, supra,* 605 F.2d at 1282. Rather, the statutory provision must be construed in a "common sense and realistic fashion." *United States v. Rug-*

*giero, supra,* 726 F.2d at 924; *United States v. Ivic,* 700 F.2d 51, 57 (2d Cir.1983). The Court does not believe that the limited success achieved by government agents in observing the clothing store from the street, and on one occasion speaking with the owner, precludes authorization of a telephone wiretap. In the context of a large-scale narcotics conspiracy, which acts covertly and employs codes to communicate, the government's best chance to collect evidence may be the interception of oral and wire communications. The particular need for electronic surveillance in investigating secretive, large-scale criminal conspiracies has been recognized in prior cases. *United States v. Wilkinson,* 754 F.2d 1427 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Ruggiero, supra,* 726 F.2d at 924.

LoBuglio also argues that the tapes of the Rocco Ambrosio wiretaps were not timely sealed. In one instance, the government sealed the tapes two days after the termination of the authorization order, which is, as previously discussed, within the Second Circuit's definition of "timely." *See United States v. Ojeda Rios, supra,* 875 F.2d at 20; *United States v. Massino, supra,* 784 F.2d at 158. In another instance, the government did not seal the tapes within the two-day limit due to an intervening weekend. As there is no evidence of tampering with the tapes, or of prejudice to the defendant, the Court denies LoBuglio's motion to suppress any of the Rocco Ambrosio tapes for failure to seal them in a timely fashion.

### III. FRANCESCO INZERILLO'S MOTION

Francesco Inzerillo has filed a motion to suppress recordings made from wiretaps on several telephone lines in Philadelphia, Pennsylvania and southern New Jersey (collectively, the "Philadelphia wiretaps"). Inzerillo argues that government interceptions over the Philadelphia wiretaps fail minimization requirements, as the government did not secure Sicilian interpreters to perform simultaneous transla-

tion of the intercepted conversations. Only one government agent involved in the investigation, FBI Special Agent Steven Salvo, spoke Sicilian, and attempts to hire other Sicilian speakers through local language schools failed. The government translated the recorded conversations and effected minimization after interception.

Section 2518(5) of Title III provides in part that:

in the event the intercepted communication is in code or a foreign language, and an expert in that foreign language or codes is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

As previously stated, "a determination as to whether minimization has been complied with requires an assessment of the reasonableness of the interceptions in light of the purpose of the wiretap and the totality of the circumstances of each case." *United States v. Napolitano, supra,* 552 F.Supp. at 476 (*citing Scott v. United States, supra,* 436 U.S. at 130, 98 S.Ct. at 1719). Title III requires the government to make reasonable efforts to provide for simultaneous translation and minimization, but that non-simultaneous minimization is acceptable if done as soon as practicable after interception.

In *United States v. Francesco Gambino,* 728 F.Supp. 1150 (E.D.Pa.1989), Judge Louis C. Bechtle of the Eastern District of Pennsylvania ruled on the admissability of the Philadelphia wiretaps in a prosecution of narcotics traffickers closely associated with the defendants in the pending case. In a Memorandum Order dated August 28, 1989, Judge Bechtle denied a motion made by Francesco Gambino based on identical grounds as the motion now filed by Francesco Inzerillo. Judge Bechtle found that the government had complied with the minimization requirements of Title III. The court detailed the process of post-interception minimization undertaken by Special

Agent Salvo, in which he only translated into English those conversations which he deemed relevant to the criminal investigation. The court ruled that the government had established that "simultaneous minimization was 'reasonably unavailable' and that the government's efforts were sufficient to meet their burden of minimization under the totality of the circumstances." Memorandum Order, dated August 28, 1988, at 6.

The Court agrees with the ruling of Judge Bechtle. The government should only be put to the expense and delay of securing simultaneous minimization if the privacy interests of the defendant clearly warrant such protection. The process of post-interception minimization undertaken by Special Agent Salvo provides essentially the same protection of privacy interests as does simultaneous minimization; in each case, only one government agent is privy to all conversations, and only the relevant conversations are translated into English and preserved as potential evidence. Given the difficulty and expense of providing for simultaneous translation of Sicilian conversations, and the delay in activating the wiretaps that such a requirement might have caused, the Court finds that the government's minimization efforts are acceptable under Title III and the fourth amendment.

## IV. FRANCESCO CIPRIANO'S MOTION

■ On November 30, 1988, Judge Costantino signed a warrant to search the premises at 1752 60th Street, First Floor, in Brooklyn, New York. (*See* Cipriano Ex. A). Defendant Francesco Cipriano lived in the building for certain time periods under a lease which indicated that he and his family lived in a second floor apartment. The search warrant did not mention Cipriano by name, or give any other indication as to whose residence should be searched.[21]

---

**21.** The government's application for a warrant was supported by an affidavit sworn to by Special Agent John G. Nemec, Jr. The affidavit did mention Francesco Cipriano by name, and was based primarily on evidence collected through electronic surveillance. Cipriano claims, however, that the officers who executed the search only possessed the warrant, and not the affidavit, and thus that they did not possess any document bearing Cipriano's name.

The warrant stated that the following items might be found on the premises— books, records, ledgers, addresses, telephone numbers, and other papers relating to the distribution of narcotics and gambling; money, jewelry, and keys to safe deposit boxes; paraphernalia relating to the packaging, cutting, weighing, storing, and distributing of narcotics, and perhaps caches of heroin and cocaine; and firearms and ammunition. (Cipriano Ex. A).

The government argues that Cipriano's "second floor" apartment is actually on street level, and that the basement apartment at 1752 60th Street has been designated only by the landlord as the first floor apartment. (*See* affidavit of Agent Billivan Johnson, sworn to on January 16, 1990, Govt.Ex. 7). The government states that simply because Cipriano considers his apartment to be on the second floor "does not change the fact that Cipriano's residence is the only apartment whose entrance is at street level immediately inside the front door of the building." Government's Memorandum of Law, at 70 n. *.

Photographs of the front of the building at 1752 60th Street have been supplied by Cipriano. (*See* Cipriano's Letter Memorandum in Reply, dated February 15, 1990, Ex. A and B). The photographs indicate that a short flight of steps leads up to the main front door of the building, which Cipriano refers to as the second floor. Underneath the steps and adjacent to a carport is the basement apartment, or what Cipriano refers to as the first floor. It appears that the basement apartment is slightly below street level; however, more importantly, it appears to the Court that what Cipriano refers to as the second floor apartment would be considered by most to be a first floor apartment. In addition, the street number "1752" is prominently displayed to the side of the door leading to this apartment.[22]

The fourth amendment to the U.S. Constitution requires that search warrants shall only issue "particularly describing the place to be searched." It has been well established that the particularity clause should be interpreted with common sense, and that it "is enough if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended" to be searched. *Steele v. United States,* 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925); *see also United States v. Gomez,* 42 F.R.D. 347, 347 (S.D.N.Y.1967) ("the standard is one of practical accuracy, not technical nicety"). The likelihood that another premises will be mistakenly searched is also relevant to the court's consideration. *See United States v. Gitcho,* 601 F.2d 369, 371 (8th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (citations omitted).

When the executing officers know from personal knowledge which apartment is to be searched, a "slight variance" in the warrant will not cause suppression. *See United States v. Campanile,* 516 F.2d 288, 291 (2d Cir.1975). The Ninth Circuit has held that information in the affidavit may only be used to satisfy the particularity requirement when the affidavit accompanies the warrant at execution, and when the warrant incorporates the affidavit. *United States v. Hayes,* 794 F.2d 1348, 1354 (9th Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). The name of the occupant, if known by the executing officers, will prevail over a wrongly stated apartment number, if due to an accident in transposition. *See United States v. Christopher,* 546 F.2d 496 (2d Cir.1976); *see also United States v. Clement,* 747 F.2d 460 (8th Cir.1984).

At an evidentiary hearing before the Court on March 20, 1990, the government presented testimony by Special Agent Patrick Donnelly of the FBI, who both arrested Cipriano on the night of December 1, 1988, and executed the search warrant at Cipriano's residence. Special Agent Donnelly testified that during the week prior to December 1, he had conducted a "site sur-

---

**22.** As indicated by Agent Donnelly's testimony, referred to *infra,* there is one door at the basement level, and two doors side-by-side on the first floor level, the left hand door leading to Cipriano's apartment.

vey" of Cipriano's residence, observing the building from both the front and the rear. In his notations during the site survey, Donnelly referred to the lowest apartment in the building as the "basement level" and stated that "[t]he 1st and 2nd levels are entered by separate side-by-side doors on the porch (1st) level. It appears that the left door is the entrance for the 1st level and the right door for the 2nd level upstairs." (Govt.Ex. 2 at evidentiary hearing, March 20, 1990). Donnelly did not at that time speak with anyone concerning which door led to the Cipriano residence, nor did he note any names inscribed on the mail boxes or doors.

On the night of December 1, 1988, after arresting Cipriano at the Caffe Giardino, Donnelly drove with Cipriano to Cipriano's residence where additional FBI agents were waiting to execute the search. On cross-examination, Donnelly testified that he confirmed with Cipriano which door led to Cipriano's apartment while sitting in the automobile, though Donnelly could not remember the exact words spoken. Donnelly then went to the front door of the Cipriano residence and knocked or rang the doorbell. When a woman answered the door, Donnelly ascertained that she was Cipriano's wife, and that the apartment was the Cipriano residence. The agents then executed the search warrant.

Under the relevant caselaw, the government has demonstrated that the actions of Special Agent Donnelly were reasonable and lawful given the warrant and the circumstances of its execution. Donnelly had previously visited the site of the search and decided that the "first floor" apartment was entered through the left hand door on the first level, up the short flight of stairs from the driveway. He confirmed his knowledge of the location of Cipriano's apartment with both Cipriano and Cipriano's wife prior to executing the warrant. Cipriano's argument that the warrant as written created the danger of a search of the wrong premises is not meritorious. Indeed, the Court finds that from the view of

the "common sense New Yorker," a phrase used by government counsel, it was most likely that the "first floor" apartment in such a building would be entered by the door chosen by Special Agent Donnelly. The Court denies Cipriano's motion for suppression.

## V. CARMELO GUARNERA'S MOTION

▮ Defendant Guarnera moves the Court to suppress physical evidence seized from his house by federal agents on December 1, 1988. Judge Costantino issued a search warrant for the Guarnera residence based on an affidavit sworn to by Special Agent Nemec. Guarnera argues that the limited reference to him in the affidavit does not establish probable cause that he was involved in criminal activity, or that evidence of criminal activity would be found at his home. The government contends that the references to Guarnera in the Nemec affidavit, when read in the context of the entire affidavit, support probable cause to search Guarnera's residence. In the alternative, the government claims that the seized evidence should be admissible under the good faith exception to the exclusionary rule set out in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

The Nemec Affidavit establishes that Guarnera is the uncle of defendants Giuseppe and Salvatore D'Amico and works with Salvatore D'Amico at Concorde Furniture, the business of defendant Matteo Romano. (¶ 30). Special Agent Nemec also recounts in the affidavit several telephone conversations that Guarnera had with Salvatore D'Amico during which the two men discussed business transactions involving furniture. Agent Nemec explains that the defendants have developed a verbal code to refer to narcotics transactions by items of furniture, for example, a "table," a "room," or a "mahogany bedroom." (¶ 276).[23] In one conversation, D'Amico explained to Guarnera that he was intending

---

**23.** *See* the Court's discussion of the probative value of the expert testimony of government narcotics agents, footnote 19, *supra*.

to import a "container of furniture" from Italy for some friends from Canada. On another occasion, Guarnera appeared to secure a supply of "rooms" for interested buyers who had been in contact with D'Amico. Guarnera stated: "I ... maybe Wednesday I should get new catalogues, you understand, good rooms." Finally, the government argues that Nemec's affidavit demonstrates the frequent use of the conspirators' homes as storage places for narcotics and large amounts of cash.

As stated above, courts reviewing the issuance of search warrants should consider the basis of the warrant with deference to the issuing court. *United States v. Nersesian, supra,* 824 F.2d at 1306. Probable cause is not the equivalent of a prima facie showing of criminal activity, but rather is a demonstrated probability that criminal activity has or will take place. *United States v. Travisano,* 724 F.2d 341, 346 (2d Cir.1983). Affidavits submitted in support of applications for search warrants should be read as a whole and in a common sense, realistic manner. *United States v. Harris, supra,* 403 U.S. at 577–79, 91 S.Ct. at 2078–80. Finally, and most applicable to Guarnera's motion, the Second Circuit has held that the testimony of a law enforcement agent experienced in narcotics investigations that individuals involved in narcotics trafficking are likely to keep incriminating evidence in their residences is sufficient to establish probable cause to issue a warrant for the search of those residences. *United States v. Benevento, supra,* 836 F.2d at 70–71.

Given these legal standards, the Court finds that the warrant issued by Judge Costantino for the search of Guarnera's house was supported by probable cause. There is direct evidence of Guarnera's involvement in the narcotics business through the intercepted conversations. There is the additional circumstantial evidence of Guarnera's relationships with defendants Salvatore D'Amico, Giuseppe D'Amico, and Matteo Romano, concerning whom the government has substantial evidence of narcotics trafficking, and Guarn-

era's employment by Concorde Furniture, a suspected locus of drug dealing. Considering the size and time frame of the alleged conspiracy charges against Guarnera and the other defendants, the government's probable cause showing did not become stale simply because the government waited five and one-half months to seek a search warrant. For these reasons, Guarnera's motion to suppress the physical evidence seized from his residence on December 1, 1988 is denied.

## VI. SALVATORE CANDELA'S MOTION

■ Defendant Salvatore Candela moves the Court to suppress physical evidence seized from his residence on December 1, 1988. The search was carried out by federal agents pursuant to a warrant issued by Judge Costantino based on Special Agent Nemec's affidavit. Candela claims that the affidavit did not establish probable cause to believe that evidence of narcotics trafficking would be found at his residence. In fact, Candela claims that he was not even living at the apartment in question at the time when the government contends that he engaged in drug transactions.

The following evidence of Candela's involvement with narcotics is contained in the Nemec affidavit: first, that on August 5, 1988, Candela delivered a substantial quantity of heroin sold by Giovanni Zarbano to William Kane, and then delivered the $40,000 in proceeds to his father, Pietro Candela; second, that on September 16, 1988, Candela and Zarbano were involved in an attempt to distribute five kilograms of cocaine to a confidential informant; third, that on September 19, 1988, Candela and Francesco Gambino were seen speaking with co-defendant LoBuglio, who later on that same day told an undercover agent that he had met with his narcotics suppliers, but had been unable to secure heroin; and fourth, that on September 20, 1988, Candela engaged in a cryptic phone conversation with Zarbano, which the government suggests concerned drug trafficking.[24]

24. *See* footnote 19, *supra.*

In light of the caselaw already discussed in reference to Carmelo Guarnera's suppression motion, the Court finds that the Nemec affidavit established probable cause to issue a warrant for the search of Salvatore Candela's residence on December 1, 1988. The affidavit certainly established probable cause that Candela was involved in at least one large narcotics transaction, and perhaps two other attempted transactions, in the weeks prior to the application for a warrant. The affidavit also establishes that law enforcement officers involved in large narcotics conspiracy investigations have frequently found important evidence of criminal activity in the residences of the conspirators. The Court accepts this reasoning and denies Candela's motion for suppression.

 Candela also moves the Court to strike the word "sample" from the indictment in describing a small quantity of heroin found at Candela's residence on December 1, 1988. *See* Indictment, 6th "S" 88 Cr. 919, counts one and two, overt act 171. Candela argues that the use of this word is highly prejudicial, and that there is no evidence whatsoever that the quantity of heroin found at his residence was a "sample" of any conjectured larger quantity. The government argues, and the Court agrees, that there is no reason to disturb language in an indictment passed down by the grand jury, and that whether the heroin found at Candela's residence is indeed a "sample" of a larger quantity is now a question of fact for the jury at trial.[25]

### CONCLUSION

Defendant Giuseppe Gambino's motion to suppress evidence collected through electronic surveillance of the Caffe Giardino is denied. Defendant Salvatore LoBuglio's motion to suppress evidence collected over wiretaps of (718) 259–0122, (718) 234–9225,

and (212) 463–8187 is denied. Defendant Francesco Inzerillo's motion to suppress evidence collected over the Philadelphia wiretaps (as defined *supra*) is denied. Defendant Francesco Cipriano's motion to suppress physical evidence seized from his home on December 1, 1988 is denied. Defendant Carmelo Guarnera's motion to suppress physical evidence seized from his home on December 1, 1988 is denied. Defendant Salvatore Candela's motions to suppress physical evidence seized from his home on December 1, 1988, and to strike the word "sample" from overt act 171 in counts one and two of the pending indictment are denied.

SO ORDERED.

---

**25.** On the subject of prejudicial words, the Second Circuit recently found a defendant's argument unpersuasive that references to violence and the "mafia" deprived him of a fair trial. *United States v. Villegas*, 899 F.2d 1324, 1350 (2d Cir.1990) (line of questions relevant to co-defendant's attempt to show intimidation). In any event, the issue for the Court at trial is whether otherwise inflammatory or prejudicial evidence

is logically connected to the crimes charged in the indictment. *United States v. Bari*, 750 F.2d 1169, 1180 (2d Cir.1984), *cert. denied sub nom. Benfield v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). In general, in the absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded. *United States v. Jamil*, 707 F.2d 638, 644 (2d Cir.1983).