Glen A. BOHANAN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6907.

Court of Appeals of Alaska.

Nov. 26, 1999.

---

12. *Andrews,* 707 P.2d at 907. *See also* SINGER, *supra* Note 1.

Frederic E. Brown, Fairbanks, for Appellant.

Marcelle K. McDannel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Glen A. Bohanan was convicted of second-degree sexual assault[1] and attempted first-degree sexual assault[2] for trying to rape D.B., one of his wife's friends. He now appeals these convictions, asserting a variety of errors. For the reasons explained here, we affirm Bohanan's convictions.

*Facts pertaining to Bohanan's claim that some of the State's evidence was gathered illegally*

Bohanan and his family lived in Fairbanks. D.B., a close friend of Bohanan's wife, was visiting from Lake Minchumina. On May 9, 1997, Bohanan invited D.B. to his house while his wife and children were not home. Bohanan kissed D.B. several times on the mouth, groped her breasts and buttocks,

---

1. AS 11.41.420(a).

2. AS 11.41.410(a).

pushed his groin against her in a simulation of sexual intercourse, and held her tightly as he tried to lead her into a bedroom. D.B. eventually broke away from Bohanan and fled the house.

After D.B. reported Bohanan's conduct to the state troopers, the troopers decided to have D.B. telephone Bohanan in an attempt to obtain incriminating statements from Bohanan. The troopers obtained a *Glass* warrant [3] to monitor these anticipated conversations.

The troopers planned for D.B. to call Bohanan from the trooper station, where recording equipment was installed, but the plan was made difficult by the fact that D.B. lived in Lake Minchumina. The initial *Glass* warrant was not executed because D.B. could not make it into Fairbanks from Lake Minchumina. The warrant was extended, but again D.B. had difficulty coming to Fairbanks, and when she was available, the officer in charge of the investigation was out of town. Finally, everything was ready and D.B. called the Bohanan residence, but Bohanan's wife answered the phone. D.B. did not try to engage Bohanan in conversation about the sexual assault because she believed that Bohanan would not speak freely in the presence of his wife.

After these attempts, the troopers changed their tactics. There were no officers in Lake Minchumina, and D.B. could not stay in Fairbanks any longer, so the troopers gave D.B. one of their telephones and a tape recorder. They told D.B. to take this equipment home and to try to call Bohanan from Lake Minchumina. The troopers also instructed D.B. on how to elicit the kinds of statements that would be helpful to the case.

Later, D.B. contacted the troopers and informed them that she had been successful in talking to Bohanan about the sexual assault. But when D.B. described the conversations with Bohanan, the troopers learned that D.B.'s husband had also talked to Bohanan during one of the conversations. This had not been part of the troopers' plan, and they had not asked D.B.'s husband to partici-

pate in the electronic monitoring. Based on this new information, the troopers applied for another *Glass* warrant that authorized both D.B. and her husband to engage in taped conversations with Bohanan.

After Bohanan was indicted, he asked the superior court to suppress all of the *Glass* warrant tapes because the taping had been done by civilians rather than by the troopers themselves. Bohanan also asked the court to suppress the conversation in which D.B.'s husband participated before his name was added to the *Glass* warrant. Superior Court Judge *pro tempore* Jane F. Kauvar denied these motions, and Bohanan renews his arguments on appeal.

*Civilian participation in the execution of a* Glass *warrant*

Bohanan argues that only police officers can execute *Glass* warrants. He relies on AS 12.35.120, which defines "search warrant" as a written order, signed by or at the direction of a judicial officer, "directed to a peace officer, commanding the peace officer to search for personal property and bring it before the judge". (Alaska Criminal Rule 37(a)(3) also specifies that a search warrant "shall be directed to a peace officer [and] shall command the officer to search the person or place named for the property specified [in the warrant]".) Bohanan contends that the procedure used in his case—having D.B. operate the recording equipment by herself—must be illegal because search warrants are directed to police officers.

Bohanan's argument ignores the Alaska statutes that authorize police officers to enlist the aid of civilians. AS 12.25.090 states that "[a] peace officer making an arrest may orally summon as many persons as the officer considers necessary to aid in making the arrest." And AS 12.35.040 declares that an officer "has the same power and authority . . . to call any other person to the officer's aid" when the officer is executing or serving

---

3. *See State v. Glass,* 583 P.2d 872 (Alaska 1978), *on rehearing,* 596 P.2d 10 (Alaska 1979) (holding that the Alaska Constitution requires police to obtain judicial authorization before electronically monitoring or recording a person's private conversations).

a search warrant.[4] Indeed, AS 18.65.100 grants even broader powers to members of the Alaska State Troopers:

Power to command assistance from others.

The Department of Public Safety and members of the state troopers may command the assistance of any able-bodied person to aid in accomplishing the purposes of AS 18.65.020–18.65.110, and when called, the person, during the time assistance is required, is considered a member of the state troopers and subject to AS 18.65.020–18.65.110.

The purposes of 18.65.020—110 include "the enforcement of all criminal laws of the state, [including] obtain[ing] legal evidence".[5] Thus, both AS 18.65.100 and AS 12.35.040 authorized the state troopers to enlist civilian aid in executing the *Glass* warrant in Bohanan's case.

No prior Alaska appellate case has discussed how broad this statutory authorization might be, but cases from other states illustrate many recurring situations where civilians do the primary work in the execution of search warrants. Medical personnel actually perform the seizure when a search warrant calls for the drawing of blood or the examination or sampling of body tissues.[6] Bank officials and computer operators actually perform the retrieval and copying when a search warrant calls for production of financial records.[7] Police often recruit large num-

bers of civilians (whether formally deputized or not) to aid in investigations that require the search of a large area of land or water.[8] And undercover agents often carry the recorder or monitoring device and control its operation during the execution of an electronic monitoring warrant.[9]

See, generally, *Civilian Participation in [the] Execution of [a] Search Warrant as Affecting [the] Legality of [the] Search*, 68 A.L.R.5th 549 (1999); Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 4.10(d), Vol. 2, pp. 676–77.

In many jurisdictions, the statute that authorizes civilian participation in the execution of search warrants expressly requires that a police officer to whom the warrant is addressed be present and acting in the execution of the warrant.[10] Our Alaska statutes contain no such proviso. Nevertheless, when civilians aid in the execution of a warrant, there are generally sound reasons to require the presence or at least the supervision of one or more police officers. As the Florida Court of Appeals noted,

Police officers are sworn officers of the law who take appropriate oaths to carry out the provisions of the federal and state constitutions and the laws of the state and nation. This oath is of no small moment as a protection to our citizens when their privacy is lawfully intruded upon by a

---

4. *See also* AS 12.60.190 (authorizing judges, magistrates, and police officers to "command the aid of a sufficient number of persons, armed or otherwise, as may be necessary" to disperse a riotous assembly); AS 12.70.070 (authorizing police officers to "command the aid of all peace officers and other persons" to assist in executing an extradition arrest warrant).

5. *See* AS 18.65.080.

6. *See Harris v. State*, 260 Ga. 860, 401 S.E.2d 263, 266 (1991) (holding that a magistrate was empowered to issue a search warrant authorizing the police to enlist the aid of a dentist in examining a suspect's teeth in an attempt to match the suspect's dental structure with bite marks found on the victim).

7. *See State v. Kern*, 81 Wash.App. 308, 914 P.2d 114, 117–18 (1996) (upholding the search of bank records when the police officer, who was unqualified to search the records, allowed disin-

terested bank employees to conduct the search authorized by the warrant).

8. *See Bradford v. State*, 184 Ga.App. 459, 361 S.E.2d 838, 839 (1987) (even though state law declared that a search warrant must be directed to peace officers, the court upheld a search of the defendant's land conducted primarily by private citizens who were temporarily recruited as "reserve deputies" under the supervision of regular police officers).

9. *See United States v. Gambino*, 734 F.Supp. 1084, 1090–93 (S.D.N.Y.1990) (upholding the admissibility of evidence obtained through electronic monitoring performed by an informant against the defendant's claim that, under the warrant, only FBI agents were authorized to install and maintain the devices).

10. *See*, for example, 18 U.S.C. § 3105 *and* Florida Statute 933.08 (quoted in *Morris v. State*, 622 So.2d 67, 68 (Fla.App.1993)).

search pursuant to a warrant. [Police officers] are especially charged and trained to see that the search is carried out properly, lawfully, and in accord with the provisions of the warrant. There is no provision in [our statutes] that would permit this responsibility to be delegated to an unauthorized person.

*Morris v. State,* 622 So.2d at 69.

But the warrant in Bohanan's case was a *Glass* warrant. And execution of a *Glass* warrant does not raise the same policy concerns as execution of the usual search warrant.

A typical search warrant authorizes physical invasion of a person's land, or inspection and seizure of a person's property, or both. But a *Glass* warrant does not authorize a trespass to land or chattels.[11] Rather, a *Glass* warrant authorizes a different type of invasion of privacy: it allows one participant in a conversation to monitor or record that conversation. Because *Glass* warrants do not involve a person's right to physical privacy, these warrants do not raise questions as to whether the police (or their agents) ventured into premises or containers they were not authorized to enter, or inspected or seized property beyond the scope of the warrant. For this reason, it is not so important to have a police officer physically present during the execution of a *Glass* warrant. (Indeed, the open presence of a police officer would often defeat the purpose of the *Glass* warrant, by insuring that nothing of substance was said.)

The decision of the federal district court in *United States v. Gambino*[12] is instructive on this point. A federal judge had issued a warrant authorizing FBI agents to surreptitiously enter the defendant's premises and install electronic devices to monitor the defendant's conversations. Rather than having FBI agents enter the premises, the FBI enlisted their undercover informant (who was a trusted confidant of the defendant, and who had the run of the premises) to install, maintain, and replace these electronic devices during the course of the investigation.

Federal law (18 U.S.C. § 3105) authorized police officers to enlist the aid of civilians in the execution of search warrants, but only if an officer was "present and acting in execution [of the warrant]". Based on this statute, Gambino argued that the undercover agent's installation, maintenance, and replacement of the monitoring devices was illegal, and Gambino's recorded conversations should be suppressed. But the district court concluded that, notwithstanding the statute, the FBI had acted properly when they relied on their undercover informant to install and maintain the monitoring devices.

The district court recognized that the electronic monitoring warrant infringed on two distinct privacy interests: Gambino's right to physical privacy on the premises where the monitoring devices were installed, and Gambino's right not to have his conversations intercepted and recorded.[13] But the court concluded that neither of these privacy interests was unlawfully infringed.

Gambino's right of physical privacy was not infringed because, even though the warrant authorized FBI agents to trespass onto the premises and install the devices, they never did. Instead, the FBI relied on the undercover agent to do this—and the undercover agent had Gambino's permission to enter all areas where the monitoring devices were installed. Gambino's right of privacy in his conversations was infringed, but it was infringed on the authority of the warrant. The fact that the undercover informant (acting at the behest of the FBI) placed and maintained the monitoring devices authorized by the warrant did not alter the scope or quality of this invasion of Gambino's privacy.[14] For these reasons, the federal district court upheld the electronic monitoring.

Bohanan's case is analogous. He suffered no trespass to land or property. His privacy was infringed, but only in the way contemplated by the *Glass* warrant: his telephone

---

**11.** We previously acknowledged this distinction in *Steffensen v. State,* 900 P.2d 735, 742–43 (Alaska App.1995).

**12.** 734 F.Supp. 1084 (S.D.N.Y.1990).

**13.** *See Gambino,* 734 F.Supp. at 1093.

**14.** *See id.*

conversations relating to this offense were recorded. Moreover, unlike the federal statute that confronted the district court in *Gambino*, AS 12.35.040 and AS 18.65.100 do not explicitly require the state troopers to be physically present when civilians aid them in executing a warrant. And we note that, even though the troopers were not physically present when D.B. used the recording equipment, they did supervise her participation in the *Glass* warrant—not only by instructing her on the use of the equipment, but also coaching her as to the kinds of statements that would be helpful to the investigation, and giving her hints on how to elicit these statements from Bohanan.

We assume that Alaska law requires police officers to participate or supervise the execution of a search warrant to some degree, even when they enlist the aid of civilians. But we agree with the Supreme Court of Massachusetts that there is a "wide variety of circumstances in which police may seek civilian assistance in conducting a warranted search", and "the required level of [police] supervision varies depending on the circumstances".[15] In Bohanan's case, even though the troopers instructed D.B. to take the recording equipment home with her and engage Bohanan in conversation without the direct participation of any state trooper, we conclude that the required level of supervision was met.

*D.B.'s husband's participation in eliciting and recording Bohanan's statements before the troopers obtained a* Glass *warrant that specifically authorized the husband's participation*

The foregoing discussion answers Bohanan's challenge to the taped statements elicited by D.B., as well as the statements elicited by her husband after the troopers obtained a modified *Glass* warrant that specifically authorized him to engage in conversations with Bohanan. What remains is Bohanan's challenge to the statements elicited jointly by D.B. and D.B.'s husband before the husband's name was added to the *Glass* warrant.

■ We concede that D.B.'s husband probably intended to advance the criminal investigation when he elicited the statements from Bohanan. But a private citizen does not become a government agent simply because they conduct a search out of a desire to aid law enforcement authorities.[16]

■ At the hearing on Bohanan's suppression motion, the troopers testified that they did not ask D.B.'s husband to participate in executing the *Glass* warrant, and they were surprised when they learned what he had done. As soon as the troopers learned that D.B.'s husband had joined in one of the taped conversations, they applied for a modified *Glass* warrant. Based on this testimony, Judge Kauvar could properly find that D.B.'s husband was not working in conjunction with the troopers when he elicited the challenged statements from Bohanan—and that the husband's attempt to aid the execution of the *Glass* warrant was in the nature of a private search, not governed by the search and seizure clauses of the federal and state constitutions.

Bohanan argues that, given the circumstances, the troopers could reasonably expect that D.B.'s husband would try to talk to Bohanan and would use the recording equipment to tape Bohanan's statements—and that, therefore, D.B.'s husband should be deemed a government agent. This is one possible inference from the evidence, but Judge Kauvar reached the opposite conclusion. Bohanan has not shown that the judge's view of the evidence is clearly erroneous.[17]

For these reasons, we conclude that Bohanan's statements to D.B.'s husband (before his name was added to the warrant) were admissible. And, given our previous conclusion that Bohanan's other taped statements

---

15. *Commonwealth v. Sbordone*, 424 Mass. 802, 678 N.E.2d 1184, 1189 (1997).

16. *See State v. Dold*, 44 Wash.App. 519, 722 P.2d 1353, 1355 (1986); Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 1.8(b), Vol. 1, p. 225 n. 46.

17. *See Wilburn v. State*, 816 P.2d 907, 911 (Alaska App.1991) (an appellate court is to uphold a trial judge's findings of fact concerning a suppression motion unless those findings are clearly erroneous).

were admissible, we uphold the superior court's denial of Bohanan's suppression motion.

*The superior court's decision to allow the State to introduce testimony from the victim of a prior sexual assault committed by Bohanan*

■ Bohanan's assault on D.B. ended with sexual contact only. To prove the charge of attempted first-degree sexual assault, the State had to establish that Bohanan acted with the intent to engage in sexual penetration with D.B. For this purpose, both at grand jury and at trial, the State offered testimony from B.J., a woman who was sexually assaulted by Bohanan in 1984.

B.J., like D.B., was a woman who became friends with Bohanan's wife through church activities. As he did with D.B., Bohanan assaulted B.J. in his house when no one else was home. Like the assault on D.B., the assault on B.J. began with fondling and groping. But B.J. was ill and could not get away from Bohanan; thus, while D.B. was able to escape outside, B.J. became the victim of coerced sexual penetration.

Bohanan argued that his assault on B.J. was too remote in time and too dissimilar to the alleged assault on D.B. to be admissible. But Judge Kauvar ruled that this evidence was relevant to establishing Bohanan's intent to engage in sexual penetration when he assaulted D.B.. At the same time, Judge Kauvar barred the State from introducing evidence of another assault Bohanan committed in 1978. The judge ruled that this 1978 assault was "[so] far back" that its probative value was outweighed by its potential for unfair prejudice.

On appeal, Bohanan renews his claim that the assault on B.J. was so dissimilar to the

assault on D.B. that it lacked probative value. We have just described the circumstances common to the two assaults. Given these circumstances, Judge Kauvar did not abuse her discretion in finding that Bohanan's assault on B.J. was probative of his intent when he assaulted D.B.[18]

Bohanan also renews his claim that the assault on B.J. happened too long ago to be appreciably relevant. But the "remoteness" of a prior crime does not hinge simply on a chronological calculation. A trial judge's determination of "remoteness" also involves a weighing of the circumstances surrounding the two incidents (the prior one and the charged one), an identification of the factors common to the two incidents, and an assessment of whether the probative value of these connecting factors is likely to appreciably diminish with the elapsed time.[19]

In Bohanan's case, Judge Kauvar was clearly aware of the remoteness issue, and she took the passage of time into account. As noted earlier, even though Judge Kauvar allowed the State to present B.J.'s testimony about the 1984 assault, she at the same time barred the State from introducing evidence of a 1978 assault. Given this record, and given the similarities between the assault on B.J. and the assault on D.B., Bohanan has not shown that Judge Kauvar abused her discretion when she allowed the State to present B.J.'s testimony.[20]

*The superior court's denial of Bohanan's motion to dismiss the indictment*

Bohanan asserts that his indictment should be dismissed because it was based on evidence that was illegally obtained—the recorded statements obtained pursuant to the *Glass* warrant. He also asserts that his in-

---

**18.** *See Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980) (a trial judge's evidentiary rulings are to be reversed only if they constitute an abuse of discretion).

**19.** *Compare Demmert v. State*, 565 P.2d 155, 158 (Alaska 1977) (holding that the passage of eight years between the two offenses "did little to lessen the probative value of the evidence" when both offenses involved similar sexual acts committed by a mature adult on a young boy); *and Harmon v. State*, 908 P.2d 434, 438 (Alaska App.

1995) (holding that, under the circumstances, the passage of twelve years did not make the defendant's prior sexual assaults too remote); *with Freeman v. State*, 486 P.2d 967, 978–79 (Alaska 1971) (holding that evidence of a prior bad act was inadmissible because almost twenty years had elapsed between the two offenses and because the prior offense was of a substantially different nature from the charged offense).

**20.** *See Hawley*, 614 P.2d at 1361.

dictment should be dismissed because it was based on evidence that should have been excluded under Evidence Rule 404(b)—B.J.'s testimony concerning the 1984 assault. Because we have concluded that all of this testimony was admissible, we also uphold the indictment.

*The superior court's limiting instruction regarding B.J.'s testimony concerning the prior sexual assault*

■ As noted above, the superior court ruled that the 1984 assault involving B.J. was admissible because it tended to prove Bohanan's intent. Judge Kauvar gave the jury a limiting instruction concerning this evidence, but in this instruction the judge stated that the jury might consider the evidence to the extent that it revealed Bohanan's "intent or motive or plan". On appeal, Bohanan asserts that the judge committed error by improperly expanding the topics for which the jury might use this evidence.

■ Bohanan did not object to the judge's limiting instruction at the time it was given, and he later told Judge Kauvar that he would not seek another instruction on this issue. Because of his failure to object, Bohanan must now show plain error. With regard to jury instructions, "plain error" is established if the jury instruction "obviously creates a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice." [21]

There is no plain error here. Lawyers might be attuned to the technical distinctions between "intent", "motive", and "plan" as those words are used in Alaska Evidence Rule 404(b)(1), but a jury of lay persons would not. As these words are used in common speech, it is almost synonymous to assert that Bohanan's "intent" or "plan" or "motive" in attacking D.B. was to engage in sexual penetration with her. There was essentially no chance that the court's limiting instruction would induce the jury to use the evidence of Bohanan's assault on B.J. for an improper purpose.

For similar reasons, we reject Bohanan's argument that the fairness of his trial was prejudiced when the prosecutor, in opening statement, asserted that B.J.'s testimony was relevant to establishing Bohanan's "plan and motive".

*The superior court's denial of Bohanan's request to admit D.B.'s prior statement into evidence*

During cross-examination of D.B., Bohanan's attorney pointed out some inconsistencies between D.B.'s testimony and a written statement that she had earlier given to the state troopers. D.B. admitted these inconsistencies. Bohanan then asked the superior court to admit D.B.'s written statement into evidence, so that the jury could have it when they deliberated. Judge Kauvar denied this request.

■ When a witness is confronted with an inconsistent prior statement and concedes the inconsistencies, the trial judge has considerable discretion whether to allow the cross-examining party to introduce extrinsic evidence of the witness's prior statement (in this case, the writing containing the prior statement).[22] The primary factor the judge should consider is whether the extrinsic evidence has "substantial probative value beyond the mere words recorded on it".[23] In Bohanan's case, the jury was apprised that D.B. had earlier submitted a written statement to the troopers, that she had reviewed and corrected this statement, and that this statement differed in certain ways from her trial testimony.

Bohanan has not shown how the jury's ability to view the writing itself would have aided their deliberations or enhanced Bohanan's impeachment of D.B. in any substantial way. We therefore conclude that Judge Kauvar's ruling was not an abuse of discretion.

**21.** *Aviation Associates, Ltd. v. TEMSCO Helicopters, Inc.*, 881 P.2d 1127, 1131 n. 7 (Alaska 1994) (quoting *Ollice v. Alyeska Pipeline Service Co.*, 659 P.2d 1182, 1185 (Alaska 1983)).

**22.** *See Nunn v. State*, 845 P.2d 435, 440 (Alaska App.1993) (citing *Patterson v. Cushman*, 394 P.2d 657, 661 (Alaska 1964)).

**23.** *Nunn*, 845 P.2d at 441.

*The faulty jury instruction concerning attempted first-degree sexual assault*

■ When Judge Kauvar or her staff typed up the jury instructions, they made a mistake in the wording of the instruction concerning the elements of attempted first-degree sexual assault. There was no error in defining the elements of the crime; rather, the error occurred at the end of the instruction:

> If you find from your consideration of all the evidence that each of [sic] one of these propositions has been proved beyond a reasonable doubt, then you shall find the defendant guilty.
>
> If you find from your consideration of all the evidence that *each of [sic] one of these propositions has not been proved beyond a reasonable doubt,* then you shall find the defendant not guilty.

(Emphasis added.) The problem is that the second paragraph should say "any of these propositions" rather than "each one of these propositions".

The erroneous language is in the "boilerplate" of the instruction—the part that attorneys and judges are so accustomed to seeing that they often do not really "see" it. Neither Bohanan's attorney nor the State's attorney nor the court discovered this error. In fact, when Judge Kauvar read this instruction aloud to the jury, she did not pay close attention to what was actually written on the page. Instead she extemporized, reciting the second paragraph as it should have been written: "If, on the other hand, after considering all the evidence, you find any of the propositions has not been proved beyond a reasonable doubt, you shall find the defendant not guilty."

On appeal, Bohanan contends that the mistake in this jury instruction should invalidate his conviction for attempted first-degree assault. He notes that the instruction, taken literally, directed the jury not to acquit Bohanan unless they were convinced that the State had failed to prove every element of the crime. But because Bohanan did not object to this instruction until after the jury returned its verdicts, Bohanan must demonstrate plain error.

Having reviewed the record, we are convinced that if the jury perceived this problem at all—that is, if they read the last two paragraphs of the instruction more carefully than the attorneys and the judge—they must have understood that the wording of this instruction was an inadvertent mistake. We reach this conclusion for several reasons.

First, as already noted, Judge Kauvar "read" this instruction correctly when she instructed the jury orally.

Second, the equivalent paragraphs of the second-degree sexual assault instruction were worded correctly. That is, the concluding paragraph of the second-degree sexual assault instruction told the jury:

> If, on the other hand, you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, then you shall find the defendant not guilty.

It is highly unlikely that the jury would have believed that different standards of proof governed these two offenses.

Third, the jury received general instructions informing them that the government always bears the burden of proving allegations of criminal conduct beyond a reasonable doubt, and that the burden of proof never shifts to the defendant. In particular, the jury was told that "the burden is upon the prosecution to prove every essential element of the crime charged, beyond a reasonable doubt". The attorneys' summations emphasized the principle that the defendant could be convicted only if the government proved every element beyond a reasonable doubt.

Finally, if the jury had interpreted the flawed instruction literally, and if they had concluded that the State had failed to prove some (but not all) of the elements of attempted first-degree sexual assault, they would have been unable to reach a verdict. Read literally, the erroneous instruction directed the jury to convict Bohanan if the State proved all the elements of the crime, and it directed the jury to acquit Bohanan if the State failed to prove each and every element of the crime, but it failed to tell the jury what to do if the State proved some but not all of the elements. Thus, if the jury had fallen

into the error that Bohanan now suggests, and if they believed that the State had failed to prove one or more of the elements of attempted first-degree sexual assault, then the jury either would have declared themselves unable to decide this count, or they would have asked the court for further instruction. Because they did not, it is a fair inference that they were not misled by the mistaken wording of the instruction.

For these reasons, we find that the miswording of the instruction does not constitute plain error.

*Conclusion*

We have considered and rejected each of Bohanan's claims of error. Accordingly, the judgement of the superior court is AFFIRMED.