Jason M. THOMPSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10083.

Court of Appeals of Alaska.

June 26, 2009.

Beth G.L. Trimmer, Assistant Public Advocate, Appeals and Statewide Defense, and

Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

Jason M. Thompson appeals his conviction for second-degree sexual abuse of a minor (consensual sexual penetration of a child who is 13, 14 or 15 years of age by a person who is at least 17 years old and at least four years older than the child).[1] Thompson's sole claim on appeal is that the superior court should not have allowed the State to introduce the tape recordings (and derived transcripts) of two telephone conversations that the mother of the victim had with Thompson in October 2006. Thompson asserts that the State failed to establish the authenticity of these tape recordings, and that the trial judge therefore should have excluded the recordings under Alaska Evidence Rule 901.

For the reasons explained here, we conclude that the trial judge did not abuse her discretion when she concluded that the authenticity of the tape recordings was sufficiently established to warrant their admission into evidence. We therefore uphold Thompson's conviction.

### Underlying facts

In the summer of 2006, Thompson met A.D., a girl who had turned thirteen at the end of May and who would be entering the eighth grade in the fall. Thompson was eighteen years old at the time, and had already graduated from high school. Thompson and A.D. started dating, and they soon began having sexual intercourse.

A.D.'s mother was aware that her daughter was dating Thompson, and she suspected that Thompson and A.D. were having sex. She therefore spoke to both A.D. and Thompson about the nature of their relationship; she told Thompson that A.D. was only thirteen years old, and she expressed her view that their relationship was inappropriate, given the difference in their ages. However, despite the mother's misgivings, A.D. and Thompson continued their sexual relationship.

Concerned for her daughter, A.D.'s mother contacted the Alaska State Troopers. On October 13, 2006, a trooper investigator, Nathan Bucknall, contacted A.D.'s mother about this matter. After speaking with A.D.'s mother, Investigator Bucknall obtained a *Glass* warrant that authorized the recording of conversations between A.D.'s mother and Thompson.[2] Under the authority of this warrant, Bucknall gave recording equipment to A.D.'s mother, showed her how to use this equipment to record telephone conversations, and directed her to try to engage Thompson in telephone conversations about his relationship with A.D.

Two weeks later, A.D.'s mother gave Bucknall an audio tape that contained two recorded conversations between herself and Thompson. In these taped conversations, Thompson admitted that he knew that A.D. was only thirteen, and he also admitted that he had had sexual intercourse with A.D.

Based on the content of these tapes, Bucknall obtained a search warrant to search Thompson's house. The trooper executed the search warrant on November 2nd, and he arrested Thompson at that time.

Just before Thompson's trial began, Thompson's attorney filed a motion *in limine* attacking the admissibility of the two tape recorded conversations. The defense attorney's motion was based on the fact that the taping had been done by A.D.'s mother without direct supervision by the troopers. Thompson's attorney noted that, unlike mem-

---

1. AS 11.41.436(a)(1).

2. *See State v. Glass,* 583 P.2d 872 (Alaska 1978) (holding that, under the Alaska Constitution, the police must obtain a warrant before electronical-

ly monitoring or recording a private conversation, even when one or more participants to the conversation consent to the police surveillance).

bers of the state troopers, A.D.'s mother had never been required to "take an oath to uphold the federal and state constitutions". The defense attorney suggested that, because no law enforcement officer participated in the taping, the State could not guarantee that A.D.'s mother had not tampered with the tapes or deleted exculpatory portions of the conversations before turning them over to the troopers.

After reading the defense motion, Superior Court Judge Beverly W. Cutler concluded that Thompson's concerns were pertinent to the weight or credibility of the evidence, but that these concerns did not justify exclusion of the tapes.

Later in the trial, Thompson's attorney renewed his contention that the tapes should be excluded. This time, the defense attorney declared that the State had failed to establish the necessary "chain of custody" for the tapes, and he further asserted that the tapes did not represent the "best evidence" of the conversations between Thompson and A.D.'s mother.

The doctrine of "chain of custody" refers to the need to account for the possession or whereabouts of certain types of physical evidence from the time the evidence was seized until the evidence is offered in a judicial proceeding.[3] The "best evidence" rule refers to the requirement that when a litigant wishes to prove the content of a writing, a recording, or a photograph, the litigant must normally produce an original or a duplicate of the writing, recording, or photograph (unless the litigant satisfactorily explains why no original or duplicate is available).[4]

Thompson's attorney did not explain to Judge Cutler why he believed that there was an insufficient "chain of custody" of the tape recordings. Nor did Thompson's attorney explain why he believed that the recordings themselves were not the "best evidence" of the content of the recordings.

Instead, the defense attorney asserted that the tapes were inadmissible because no state trooper was present when A.D.'s mother performed the taping. The defense attorney told Judge Cutler: "[W]hen you [execute] *Glass* warrants, the trooper should be present so [that] the names of the parties who were there can be presented, [and] who they're calling, [and] the time and date that they're calling."

Judge Cutler again concluded that the defense attorney's argument went to the weight or credibility of the evidence, rather than the admissibility of the tapes. She therefore again overruled the defense attorney's objection.

To complete our description of the underlying facts pertinent to this issue, we now set forth, in a more detailed fashion, the relevant testimony of two witnesses at Thompson's trial: A.D.'s mother, and Alaska State Trooper Investigator Nathan Bucknall.

A.D.'s mother testified that she tape recorded two conversations with Thompson. When A.D.'s mother was shown transcripts of these two recordings, she identified the transcripts as memorializing her two recorded conversations with Thompson.

A.D.'s mother further testified that she was initially reluctant to turn the recordings over to Trooper Bucknall—"because [she] knew the consequences [of] hand[ing] them over" to the authorities. However, she finally decided to give the recordings to the state troopers "to protect [her] daughter"—because she was aware of her daughter's sexual relationship with Thompson, and "[she] couldn't see it ending" unless she acted.

A.D.'s mother was unsure of the exact dates of her two recorded conversations with Thompson. She was only able to say that these conversations took place "in October ... or maybe even November" 2006. However, Trooper Bucknall was able to provide more precise dates for these conversations.

Bucknall testified that he met with A.D.'s mother on October 13, 2006. After interviewing her, Bucknall applied for a *Glass*

**3.** *State v. Morris*, 668 P.2d 857, 866 (Alaska App. 1983) (Bryner, C.J., dissenting); Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (9th ed.2006), Vol. 5, pp. 901–15 to 901–17.

**4.** Alaska Evidence Rules 1001 through 1004; *State v. Andrews*, 84 P.3d 441, 444 (Alaska App. 2004).

warrant. That evening, after obtaining the *Glass* warrant, Bucknall returned to A.D.'s mother's house. At that time, he supplied her with the equipment she would need to record her conversations with Thompson, and he instructed her in the use of this equipment.

Four days later, on October 17th, A.D.'s mother contacted Bucknall to tell him that she had recorded two conversations with Thompson, and she summarized the contents of these two conversations for Bucknall.

Bucknall told A.D.'s mother that the *Glass* warrant still had several more days to run, so she should keep trying to engage Thompson in conversation. He also told her that he would get in touch with her the following week, after the warrant expired, to retrieve the taped conversations.

Bucknall next spoke to A.D.'s mother on October 25th. At that time, she expressed reluctance to relinquish the taped conversations to him; she told him that she was not sure she wanted to continue the investigation. Bucknall gave A.D.'s mother a couple of days to think the matter over. Two days later, on October 27th, A.D.'s mother called Bucknall to tell him that she had decided to surrender the taped conversations to the troopers. Bucknall immediately went to A.D.'s mother's house, where he retrieved the physical tape that contained recordings of the two conversations.

Based on these events, and based on Bucknall's own review of the recorded conversations, Bucknall concluded that the two taped conversations introduced into evidence at Thompson's trial were the two conversations that A.D.'s mother had described to him during their conversation on October 17th. In other words, they were the two conversations that A.D.'s mother recorded sometime between October 13th (when A.D.'s mother received the recording equipment) and October 17th (when A.D.'s mother reported to Bucknall that she had recorded two conversations with Thompson, and when she summarized the contents of those conversations for Bucknall).

*Thompson's arguments that the tape recordings (and the transcripts derived from them) should not have been admitted at his trial*

On appeal, Thompson argues that the State failed to adequately establish the authenticity of the two tape recordings, and that (as a result) there was an unacceptable risk that the recordings were unreliable—*i.e.,* an unacceptable risk that the recordings were not accurate audio reproductions of conversations that really took place between A.D.'s mother and Thompson. In support of this contention, Thompson makes two discrete arguments.

■ Thompson's first argument is essentially the same contention that he made to Judge Cutler: the contention that when the police use a civilian to perform electronic recording under a *Glass* warrant, one or more officers must directly supervise or monitor the civilian's actions.

In *Bohanan v. State,* 992 P.2d 596 (Alaska App.1999), this Court held that an informant or a cooperative citizen may lawfully conduct the electronic monitoring or recording authorized by a *Glass* warrant, even when the informant or civilian acts without direct police supervision. *Bohanan,* 992 P.2d at 601.

The pertinent facts of *Bohanan* are quite similar to the facts of Thompson's case. A woman contacted the troopers and reported that Bohanan had sexually assaulted her. Based on the woman's report, the troopers obtained a *Glass* warrant, hoping that the victim could telephone Bohanan and engage him in conversation about the assault.[5] The troopers gave the woman the equipment she needed to record telephone conversations with Bohanan, they instructed her on how to use the equipment, and they gave her pointers on how to speak with Bohanan so as to elicit the kinds of statements the authorities would need to support a prosecution for sexual assault.[6]

On appeal, Bohanan contended that the tapes of these conversations should have been suppressed because the taping was

---

**5.** *Bohanan,* 992 P.2d at 598.

**6.** *Id.* at 598, 601.

done by civilians rather than police officers.[7] We held that, "even though the troopers instructed [the victim] to take the recording equipment home with her and engage Bohanan in conversation without direct participation of any state trooper, ... the required level of [police] supervision was met" and the tapes were admissible. *Id.* at 601.

In Thompson's brief to this Court, he gives lip service to *Bohanan.* He acknowledges that, under *Bohanan,* it was lawful for Trooper Bucknall to obtain a *Glass* warrant and then have A.D.'s mother initiate the conversations with Thompson and perform the recording herself. But Thompson then proceeds to argue that any and all recordings resulting from such an investigative procedure are inadmissible because no law enforcement officer directly supervised the recording:

> The [crux] of the authenticity problem in this case [is] that the *Glass* warrant was executed by an unsupervised civilian without any law enforcement monitoring.... [N]o law enforcement officer could testify that they were responsible for recording ... the calls between [A.D.'s mother] and Jason Thompson. Neither could [any] law enforcement officer testify that the entire conversations were recorded.
>
> . . .
>
> No law enforcement officer could testify that all of the conversations that occurred during [the 10–day period] of the *Glass* warrant were recorded.... [And it is of] significant consequence to the accuracy and authenticity of the [tape recordings] that no law enforcement officer could testify as to exactly when ... the [taped] conversations occurred[.]

This argument is irreconcilable with our decision in *Bohanan.* The level of police supervision in *Bohanan* was essentially identical to the level of police supervision in Thomson's case—and we held in *Bohanan* that this level of supervision was sufficient.

An implicit premise of our decision in *Bohanan* is that, when the police employ this investigative procedure, the resulting recordings will be admissible even though no law

enforcement officer is able to testify "that they were [personally] responsible for recording [the conversations]", and even though no law enforcement officer is able to give their personal assurance "that the entire conversations were recorded", or that "[every] conversation[ ] that occurred during [the period] of the *Glass* warrant [was] recorded", and even though no law enforcement officer has personal knowledge of "exactly when ... the [taped] conversations occurred".

■ Apparently, this premise now needs explicit affirmation. Accordingly, we hold that when a civilian performs the recording authorized by a *Glass* warrant under the procedures described in *Bohanan* and employed in Thompson's case, the resulting recordings are admissible even though no law enforcement officer has directly supervised or monitored the civilian's acts of recording, and even though no law enforcement officer is able to give the types of testimony that Thompson demands.

Of course, a defendant is entitled to assert that the conversations portrayed in *Glass*-warrant recordings have been selectively chosen, or selectively edited, or even altered, so as to make the defendant appear guilty. And when the date or time of a conversation is important, a defendant is entitled to assert that the date or time of the conversation has been misreported or can not be identified with certainty.

But the fact that no law enforcement officer can assert personal knowledge of these matters does not, standing alone, constitute a legal bar to the admission of the recordings. The State is entitled to rely on the testimony of the civilian who performed the recording, or on other evidence, to establish the authenticity of the recordings and to rebut the kinds of assertions listed in the preceding paragraph.

■ Thompson's second argument is that, even if police testimony was not essential, the State nevertheless failed to satisfactorily establish the authenticity of the recordings. Thompson asks us to adopt the nine-pronged test for authenticity of an audio recording set

---

7. *Id.* at 598.

forth by Professors Edward J. Imwinkelried and Daniel D. Blinka in their text, *Criminal Evidentiary Foundations* (2nd ed.2007).

According to Professors Imwinkelried and Blinka, the "strict, traditional foundation" for audio tapes requires the government to prove:

- the identity of the recording equipment;
- the fact that the recording equipment was in working order;
- the fact that the operator of the recording equipment was qualified to operate it; and
- the fact that the operator used proper procedures for making the recording.

In addition, the government is required to establish:

- the specific time and place of the recording;
- the fact that, at the time it was made, the recording was an accurate reproduction of the conversation or other audio event;
- a satisfactory chain of custody for the physical audio tape;
- proof that the audio tape offered in court is the same physical object that was produced during the original act of recording; and
- verification that the tape still contains an accurate reproduction of the conversation or other audio event.

*Id.*, § 4.06 ("Tape Recordings"), p. 135.

There is good reason to doubt that courts ever insisted on strict proof of all nine of these suggested foundational requirements. For example, an attentive reader will observe that, according to the seventh and eighth of these listed requirements, the government must establish a chain of custody for the original physical audio tape. This appears to be inconsistent with the "best evidence" rule codified in Alaska Evidence Rules 1001 through 1004. Under Evidence Rule 1003, any duplicate of an audio tape—that is, any "counterpart produced by ... electronic rerecording", *see* Evidence Rule 1001(4)—is "admissible to the same extent as an original" (absent a genuine question concerning

the authenticity of the original from which it was made, or other circumstances making it unfair to admit the duplicate in lieu of the original).

The suggested nine foundational factors become even more problematic when one considers that a large number of audio recordings are now originally created on computers or portable digital recorders. In these instances, the original recording exists only as a digital sound file on the recording device's memory chip or card.

If the recording is later to be offered as evidence in a judicial proceeding, the digital sound file must be downloaded or copied to some portable medium such as a compact disk or flash drive (unless the proponent of the evidence is willing to part with their computer or their digital recorder), or the digital sound file must be converted to analog so that it can be copied onto a magnetic cassette tape.

In these circumstances, it makes no sense to require the proponent of the evidence to prove "chain of custody" in the sense of proving that the recording medium presented in court (for example, a compact disk) is the same physical object that was produced when the original recording was performed—because the digital recording process (unlike older magnetic tape recording technologies) does not normally result in the production of a physical object to begin with.

In fact, Professors Imwinkelried and Blinka acknowledge that "courts have begun to liberalize the standards for admission of tape recordings" and that "many modern courts are no longer insisting on the traditional, strict foundation".[8] This is because "courts have gone back to fundamentals and [have] begun to treat the question of a tape recording's authenticity as a simple question of authentication under Federal [Evidence] Rule 104(b)."[9] Thus, the modern test for authentication "is ... [whether] the proponent [of the evidence has] presented suffi-

---

**8.** *Id.* at p. 134.

**9.** *Id.*

cient evidence to support a rational finding [that] the tape recording is authentic".[10]

■ Imwinkelried and Blinka explain that, under this modern approach, "the last element of the traditional foundation, standing alone, has sufficient probative value to authenticate the tape."[11] In other words, under present-day law, when a litigant offers an audio recording into evidence, the ultimate question is whether the proponent of the recording can satisfactorily establish that the recording is an accurate reproduction of the conversation or other audio event portrayed in the recording.[12]

(We note that this is essentially the same test employed in Alaska for assessing the admissibility of a photograph. See *Johnson v. State*, 636 P.2d 47, 67 (Alaska 1981), and *Kaps Transport, Inc. v. Henry*, 572 P.2d 72, 75–76 (Alaska 1977), both holding that the admissibility of photographic evidence hinges on whether the proponent of the evidence can establish that the photograph accurately depicts its subject.)

With regard to the two tape-recorded conversations at issue in Thompson's case, the State presented testimony to support the conclusions (1) that A.D.'s mother engaged Thompson in conversation about his relationship with A.D., (2) that A.D.'s mother recorded two of these conversations, and (3) that she recorded these two conversations sometime between the time Investigator Bucknall delivered the recording equipment to her on October 13th and the time on October 17th when she telephoned Bucknall to report that she had recorded two conversations with Thompson (and when she summarized the content of these conversations for Bucknall). Moreover, A.D.'s mother testified that she had reviewed the transcripts of the two recordings, and that these transcripts reflected the two conversations she recorded.

In sum, the State presented ample evidence to support the conclusion that the two recordings accurately depicted the two conversations that they purported to reproduce. Moreover, Thompson offered nothing to affir-matively rebut the State's evidence on this issue. Thompson never challenged the fact that it was his voice on the recordings, nor did Thompson challenge the fact that he had engaged in conversations with A.D.'s mother concerning his relationship with A.D., nor did Thompson present any evidence tending to show that the recordings offered by the State inaccurately portrayed the content of his conversations with A.D.'s mother.

Under these circumstances, Judge Cutler did not abuse her discretion when she concluded that the recordings (and the transcripts derived from them) were admissible, and that Thompson's objections went merely to the weight or credibility of the evidence.

On appeal, Thompson also argues that the State failed to sufficiently establish the chain of custody of the physical tape, that the tape recorded conversations were irrelevant, that (if relevant) they were unfairly prejudicial and misleading, and that admission of the recordings violated his right to due process. For the most part, Thompson's various legal theories are simply rewordings of his underlying contention that the State failed to prove the authenticity of the recordings—*i.e.*, failed to present sufficient evidence that the recordings accurately depicted the two conversations that they purported to reproduce. We have already rejected that contention.

Thompson has a slightly stronger argument on one narrow issue: it is true that the State failed to establish the precise dates and times of the two recorded conversations. However, as we have explained, the State's evidence was sufficient to support the conclusion that the two recorded conversations took place during the four-day period between Investigator Bucknall's delivery of the recording equipment to A.D.'s mother on the evening of October 13th and A.D.'s mother's verbal report to Bucknall on October 17th.

Moreover, even if the conversations conceivably occurred later (*i.e.*, sometime between October 17th and October 27th, the day that A.D.'s mother returned the recording equipment to Investigator Bucknall and gave him the tape that contained the two

**10.** *Id.*

**11.** *Id.*

**12.** *Id.*

recordings), the conversations would still be relevant. In these recorded conversations, Thompson admitted that he engaged in sexual intercourse with A.D., and he admitted that he knew that she was thirteen years old. Even if Thompson wanted to argue that these admissions did not conclusively prove his guilt—either because he ceased his sexual relationship with A.D. as soon as he discovered her true age, or because he discovered A.D.'s true age only after their sexual relationship was over—the State was entitled to ask the jury to view Thompson's statements in a more inculpatory light.

*Conclusion*

For the reasons explained here, Judge Cutler did not abuse her discretion when she overruled Thompson's objections and allowed the State to introduce the two recordings and the transcripts derived from them. The judgement of the superior court is AFFIRMED.